[Civil No. 1256.   Filed October 24, 1912.]

[127 Pac. 748.]

## H. K. CHENOWETH, Appellant, v. R. R. EARHART, Appellee.

1. APPEAL AND ERROR—PRESENTATION BELOW.—The supreme court is bound by the record made in the trial court.

2. ELECTIONS — CONTEST—SUFFICIENCY OF EVIDENCE.—In an election contest in which it was claimed that the order designating the place of election to be held in a "building" belonging to the named company, which owned a number of buildings, was ambiguous evidence *held* to show that the voters of the precinct understood that any convenient building belonging to the company could be selected by the board of supervisors.

3. ELECTIONS—POLLING PLACES—DESIGNATION—AMBIGUOUS ORDER.— Even though an order requiring an election to be held in the "C. Mining Company's building" was ambiguous, where that company owned a number of buildings in the precinct, if the election was held without fraud in a building owned by such company, and every legal voter in the precinct voted there, the election cannot be declared illegal because of the ambiguity in the order designating the polling place.

4. ELECTIONS—POLLING PLACES—CHANGE.—If the building designated in the order of the board of supervisors as the polling place of a precinct was not available for that purpose on election day, the election officers could hold the election in another available voting place in the precinct.

5. ELECTIONS—DELAY IN OPENING—DEFECT.—Where the failure to open the polls earlier than between 9:30 and 11:30 A. M. was because the election supplies had not arrived, and there were not sufficient electors to organize the election board, and no legal voter was prevented from voting by such delay, it would not require the vote of the precinct to be thrown out.

6. ELECTIONS—TIME AND PLACE — STATUTORY REGULATIONS.—Whether statutes relating to time and place of elections are to be considered mandatory or directory, a departure therefrom will invalidate the election only when it makes it impossible or very difficult to determine whether fraud was committed or anything done which would affect the result.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. Frank Baxter, Judge. Affirmed.

The facts are stated in the opinion.

Mr. S. L. Kingan, for Appellant.

Mr. W. A. O'Connor, for Appellee.

ROSS, J.—This is a contested election case. From a judgment in favor of the appellee, who was contestee in the lower court, the contestant and appellant appeals. The office involved is that of treasurer of Santa Cruz county. The canvassing board issued its certificate of election to the contestee, and declared and certified therein that the contestee had received 283 votes and the contestant 277 votes for such office. The case turns upon the vote of Mowry precinct. In this precinct 14 votes were cast—12 for contestee and 2 for contestant. If the vote of this precinct be rejected, the contestant would have 275 votes, and the contestee would have 271 votes.

It is the contention of the contestant that the vote of Mowry precinct should not be counted for two reasons: (1) Malconduct of the election officers of said precinct; and (2) illegal votes cast at said precinct. The facts, as shown by the pleadings, and the evidence in that connection, are: That the board of supervisors of Santa Cruz county designated the "Consolidated Mining, Smelting & Transportation Company's building" as the place of holding the election at Mowry precinct, and the time as December 12, 1911, and caused notices thereof to be given as provided by law. The election was held in the schoolhouse, which is in Mowry precinct. Mowry is a mining camp. At the time of the election the mines were closed down and the buildings and premises were in the charge of a caretaker. The Consolidated Mining, Smelting & Transportation Company was in possession of all the buildings (about 24 in number) as lessee. The company's buildings were a store, office and residence situated centrally and within about 100 feet of each other, and the other buildings, such as are ordinarily had at mining camps, were further removed and scattered around this central group. In front of the building that was used as an office was a painted sign with these words in large letters: "Consolidated Mining, Smelting & Transportation Company." The schoolhouse, by actual measurement, is 930 feet distant from the office building. It is conceded that the schoolhouse, as well as all the other build-

ings at the mining camp, belonged to the company, except the one occupied by Phelps. The company built the schoolhouse, but had not deeded it to the school district. It was on company ground. It was used for school purposes, dances and sometimes for elections. The company residence had been used twice for holding elections, once, at least, under the same designation by the supervisors as at the December 12, 1911, election.

The contestant insists that the designation "Consolidated Mining, Smelting & Transportation Company's building" as the place for holding the election meant the company residence, or, at least, one of the three buildings—the office, store, or residence. The contestee urges that the "Consolidated Mining, Smelting & Transportation Company's building" might mean any building owned by or under the control of the company, including the schoolhouse. He contends that there was an ambiguity as to the place meant by the supervisors in their order; and, while the contestant denies that the order was ambiguous, much of his testimony is directed to showing what building the order named.

Whatever may have been the conclusion of the lower court from a reading of the order alone, unaided by extrinsic evidence to arrive at its meaning, the trial court must necessarily have read the order in the light of the evidence introduced, and this court is also bound by the record made in that court. The ambiguity of the order is apparent from the fact that both sides indulged in the introduction of a large amount of testimony from the voters of the precinct showing, in their minds at least, that no definite place was understood by them from the order. The fact that the primary election in October, 1911, was held in the residence building of the company under the same designation did not fix that place in the minds of the voters as the one intended, as is shown by the testimony of the witnesses. The record fails to show that any considerable number who voted December 12th voted at the October primary, or knew where that election was held.

The contestant's first witness, F. J. Miller, said: ". . . There is a building there known as the Consolidated Mining, Smelting & Transportation Co.'s building, and there are other buildings there—the store building, the office building, living building, or house where the officers used to live. On the

outside of the office, in big letters, they have the name 'Consolidated Mining, Smelting & Transportation Co.' . . . All the buildings belong to the same company, and I think there is one known as the Consolidated Mining, Smelting & Transportation Company Building. There is what is called the office building, where they put up the sign, while right across from it is the store, and close to the store is the residence building, all right together. . . . When I first went into Mowry on the morning of December 12th, and went to the company building, no one was there, and I waited about two hours with the election supplies. There was a man named Krager had a tent near there, and we sat there until about 11:30, and some other men came in, and I asked one, named McPherson, where the election was being held, and he said, 'Down to the schoolhouse.' I had put the place in order, and they all came to vote, I guess. I then took the supplies down to the schoolhouse and asked the inspector of elections why the election was not held where it was advertised. . . . I took this to be the residence, because Mr. Earhart, had the election held there twice before. It is one of the Consolidated Mining, Smelting & Transportation Company's buildings. I do not swear now that the school building is not one of their buildings; I don't know anything about it. I went to the residence building at 7 o'clock on the morning of the 12th, by my time, by myself. . . ."

His next witness, Sam Proudy, said: "As an officer of the election, I went to the company's building—the office of the company where the sign was, and where I supposed the election was to be held. This is not the residence building; and I did not go to the residence building because I met Mr. Miller at Krager's place, and he said there was nobody at the polls. The building I took to be the polling place was the office building with the name on it."

A. A. Doherty, county assessor of Santa Cruz county, said: "I know several buildings belonging to the Consolidated Mining, Smelting & Transportation Company, and know all the buildings there. One, where the sign is up there, is used as an office; and if anybody made an appointment with me to meet me at the building of the Consolidated Mining, Smelting & Transportation Company, at Mowry, at 3 o'clock tomorrow I would go to that particular office building. . ."

Herbert J. Cunningham said: "From my knowledge of the location of the buildings and the schoolhouse, if I were directed to go to the building of the Consolidated Mining, Smelting & Transportation Company, I would go to that sign, to that building on which the sign is attached."

Fred Krager said: "There is a sign stuck up there, which says something like 'Consolidated Mining, Smelting & Transportation Co.,' in front of an office. I do not know what the building is known by. It has that kind of a sign on it. There are three or four buildings there; and if I were told to go to the Consolidated Mining, Smelting & Transportation Company building I would go to the store house there, or to the office, or another building there. They are all together. . . . There is a building there with that sign; but I did not go to that building with the sign on, as I had no key for that, nor to the store building. The residence is the one I suppose I had the key to, as there has been some one residing there, and there is bedding there and a bathtub. . . . "

Angel Alvarez said: "I know the camp at Mowry pretty well, and know the buildings there, and know the building there known as the Consolidated Mining, Smelting & Transportation Company building. It is just right there at the store —where they used to have the store—close by there. . . . "

On behalf of the contestee, Orton Phelps said: "I was an officer of the election held on December 12th last, and was appointed by the board of supervisors as one of the clerks, but I did not serve. I am familiar with the buildings up there, and I saw the notice—the call of the supervisors. I remember how it read, but not exactly, and it was a call for an election to be held in the company's building. As an officer of the election, I went that morning, with the other clerk, Mr. Boucher, direct to the schoolhouse and opened it. I went to the schoolhouse because I believed I was fulfilling the law and fulfilling the order of the supervisors in going to the company's building—the company built it. I was there when they built it. . . ."

S. P. Boucher said: "I was an elector at Mowry precinct last election and acted as clerk at the election. Mr. Phelps and I went to the schoolhouse that morning and opened up at 7 o'clock and got a fire going, and it was pretty cold. We waited there, and I suppose it must have been 9 o'clock before

the tally sheets came. We got everything fixed up, a booth fixed up, and waited, and the supplies came about 9:30 or 10 o'clock.''

Duke Parker said: ''I was an officer of the election and arrived at the polling place at 9 o'clock, I think. I did not know where the election was to be held, but I had to pass right by the schoolhouse coming up there, and I stopped there.''

George W. Parker, member of the board of supervisors that designated the ''Consolidated Mining, Smelting & Transportation Company building'' as the place for holding the election, said: ''I did not have any particular building in mind; any building that would be convenient for the board to select. There were a number of vacant buildings there, and so that they had an election is all I cared for. Any building would do that was convenient.''

Bud Baldwin said: ''I went to the schoolhouse at Mowry because I seen a fire there, and Mr. Boucher and Mr. Phelps were there.''

It is evident from this testimony that there was some uncertainty in the minds of the voters of Mowry precinct as to the building meant by the board's order. Miller said he took the residence building as the place meant. Proudy said he took the office building to be the place named in the board's order. Doherty and Cunningham thought the office building was intended. Krager says he took the order to mean the store house, or the office or another building there. Alvarez does not name the building he thought was intended, but said it was near the store. Phelps and Boucher thought that the order meant the schoolhouse. Duke Parker said he did not know where the election was to be held, but stopped at the schoolhouse.

We think that Supervisor George W. Parker's language fairly expressed the board's understanding of the order, and that the voters of Mowry precinct construed the order in the same sense. He said: ''I did not have any particular building in mind; any building that would be convenient for the board to select. There were a number of vacant buildings there, and so that they had an election is all I cared for. Any building would do that was convenient.'' In connection with this general understanding, it will be remembered that the order was that the polling place in Mowry precinct was the

"Consolidated Mining, Smelting & Transportation Company building," and that there were some twenty-four buildings there owned by the company, including the school building.

If the building selected by the election board fell within the terms of the order—that is, if the election was held within any building owned by the company—and there was no fraud or opportunity for fraud or misconduct on the part of or by the election board, and everybody who was entitled to vote at such precinct did vote, and his vote was counted, then no injury was suffered by any voter or candidate, and the legality of the election should be sustained. Here was an honest effort on the part of the board of supervisors, the election board, and the voters to comply with the terms of the law. No particular building was designated in their order by the supervisors in which to hold the election, but several buildings were embraced within the terms of the order; and, the board of election having selected one of those buildings, if no other reason for rejecting the vote of Mowry precinct exists, we think it should be counted.

Should it be conceded that the order of the supervisors designated the office, or store, or company residence, and that the election held in any of them would have been legal, the evidence is positive and uncontradicted that neither the store nor office could have been used, for they were locked up, and no one present had a key to them. Phelps, who was one of the election board, had a key to the schoolhouse, but to no other building embraced within the terms of the supervisors' order. If the store or office was intended by the supervisors in their order, there was absolute and immediate necessity to hold the election elsewhere, which would bring this case within the exception pointed out in *Johnstone* v. *Robertson*, 8 Ariz. 361, 76 Pac. 465.

Krager, who was temporarily in charge of the mining company's property, testified that he was ready at any time to open the residence building, but that he did not open it. He also said that Earhart had given him the key, with instructions to open the building on December 12th. In another place in his testimony he said: "The residence is the one I suppose I had the key to." The evidence fails to show that any other voter or any election officer knew or was advised by Krager that he had a key to that building.

The appellant also contends, even granting that the election was held at the place designated, or within the terms of the designation, it was not held at the time fixed by law. The witnesses differ widely as to the time of day the polls were opened. It is probable they were opened about 11 o'clock. Phelps and Boucher, two officers of the election board, were at the schoolhouse at or near 7 A. M., and remained there right along. Miller, who had the ballots and other election material, arrived at the schoolhouse between 9:30 and 11 o'clock, and as soon thereafter as enough qualified electors arrived the election board was organized and the polls opened. There were two reasons, therefore, for not opening the polls earlier, one no election supplies, and the other, insufficient electors to organize the election board.

Section 7 of Election Ordinance No. 2, adopted by the Constitutional convention and approved by Congress, provides as follows: ''Sec. 7. The board of supervisors in each county shall, at least fifteen days before said election (the election of December 12, 1911), issue its order, designating the house or place within each election precinct where the said election must be held, and appointing a board of election for each precinct.''

This section is numbered paragraph 2305, Revised Statutes of Arizona of 1901, and it and the one preceding and following it were taken from California. Appellant cites a number of California cases holding that time and place are of the substance of every election, and that the provisions of the statutes relating to time and place are mandatory. *Dickey* v. *Hurlburt,* 5 Cal. 343; *Satterlee* v. *San Francisco,* 23 Cal. 315; *Knowles* v. *Yates,* 31 Cal. 83; *Russell* v. *McDowell,* 83 Cal. 70, 23 Pac. 183; *Tebbe* v. *Smith,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454; *Atkinson* v. *Lorbeer,* 111 Cal. 419, 44 Pac. 162. But a careful examination of those cases will disclose the fact to be that in many of them, in addition to holding the election in the place not designated, or opening the polls too late, or closing them too early, there was malconduct upon the part of the election board from which fraud and injury were actually shown or presumed.

One of the latest and best considered cases in California (*Kenworthy* v. *Mast,* 141 Cal. 268, 74 Pac. 841, decided in 1903) reviews and distinguishes many of the earlier cases, and, while we conceive it to be impossible to formulate a gen-

eral rule applicable to all cases that may arise, we use the language of that court with approval: "It is practically impossible to lay down any general rule covering all cases, but we think the true test to be applied to departures from the requirements of the laws relating to the conducting of elections on the *proper day and at the proper place, be those requirements called mandatory or directory,* is as to whether or not the particular departure is of such a nature as to make it impossible or extremely difficult to determine, under the circumstances of the case, whether fraud had been committed or anything done which would affect the result. If, as was said in *Atkinson* v. *Lorbeer*, 111 Cal. 419 [44 Pac. 162], speaking of a departure from a so-called 'directory' provision, it may be easily shown that the departure was not accompanied with fraud or any act affecting the result, and such showing is made, the vote will not be rejected. If, on the other hand, the departure from the law is so gross as to give rise to a suspicion of fraud or unfairness, and the circumstances are such that in the nature of things no evidence as to the effect thereof could be satisfactory, a court will not enter upon the task of inquiry." The italics are ours. A still later California case is *People* v. *Larkspur*, 16 Cal. App. 169, 116 Pac. 702, 706, wherein a departure from the time of opening and closing the polls was involved, and that court said: "We are next to inquire whether, in such a case, the will of the majority is to be set aside on the ground now urged. We think the principles enunciated in the well-considered case of *Kenworthy* v. *Mast*, 141 Cal. 268, 74 Pac. 841, are decisive of the question.

"The general rule laid down in McCrary on Elections, sec. 165, is quoted approvingly, namely, that where there is no statutory provision expressly declaring that a failure, in the respect now being considered, shall render the election void, it will be regarded as directory only, and that, unless the deviation from the legal hours has affected the result, it will be disregarded, but if such deviation is great, or even considerable, the presumption will be that it has affected the result, and the burden will be upon him who seeks to uphold the election to show affirmatively that it has not. That burden was successfully borne in the present case." *People* v. *Larkspur*, 16 Cal. App. 177, 116 Pac. 706.

The contestee in this case has successfully shown that the result of the election at Mowry precinct was unaffected by

reason of the election being held in the schoolhouse or the late hour of opening the polls. Everybody voted in that precinct who was entitled to vote, and the votes were properly recorded and counted. No one was injured.

Nor do we think, as appellant insists, that this case is on all-fours with the case of *Johnstone* v. *Robertson*, 8 Ariz. 361, 76 Pac. 465. There the board of supervisors had designated the schoolhouse as the voting place. There was but one schoolhouse in the precinct, and persons could not differ as to the place named. The election was held, without any previous legal notice of the change, at a ranchhouse, a half mile from the schoolhouse. The territorial supreme court in that case said: "It is the general rule, to which there are very few exceptions, that the statutes relative to the time and place of holding an election are mandatory, and that an election held at any other than the designated place is absolutely void without proof of any fraud or injury. The sole exceptions we have found to this rule are those cases where the impossibility of holding the election at the place fixed by law was discovered immediately before the election, at a date too late to render possible a compliance with the law in the designation of another place. *Dale* v. *Irwin*, 78 Ill. 170; *Preston* v. *Culbertson*, 58 Cal. 198. This latter feature does not enter into the case under consideration."

Because of the uncertainty of the order of the board of supervisors designating the place for holding the election in Mowry precinct, and because of the necessity of the election officers choosing a building embraced within the terms of the designation, and because everybody entitled to vote did vote at said precinct, and because no harm or injury resulted on account of the departure in time, the judgment of the trial court is affirmed.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.

Application for rehearing denied.

---

NOTE.—As to the effect of irregularities in calling or conducting elections, see notes in 83 Am. Dec. 749; 90 Am. St. Rep. 46.