[Civil No. 3173.  Filed December 14, 1931.]

[6 Pac. (2d) 50.]

T. F. McLOUGHLIN and A. W. ROBINSON, Taxpayers of the City of Prescott, Arizona, Appellants, v. CITY OF PRESCOTT and BERT TILTON, Mayor; R. O. BARRETT, WILLIAM BYERS, FLOYD WILLIAMS and W. E. SCOTT, Councilmen of the City of Prescott, Arizona, the Foregoing Mayor and Councilmen Constituting the Governing Body of the City of Prescott; E. A. McSWIGGIN, City Assessor and Tax Collector of the City of Prescott, Arizona; PAUL E. LODGE, City Clerk of the City of Prescott, Arizona; and R. B. WESTERVELT, City Attorney of the City of Prescott, Arizona, Appellees.

Messrs. Favour & Baker, for Appellants.

Mr. R. B. Westervelt, City Attorney, for Appellees.

ROSS, J.—Pursuant to an order of the mayor and common council of the city of Prescott, a majority of the taxpayers voting, who were also qualified voters of said city, at an election held on August 22, 1931, on a proposal to issue $200,000 in bonds of the city to enlarge and improve its water system, voted in favor of said bond issue. Thereafter T. F. McLoughlin and A. W. Robinson, as taxpayers and voters of said city, brought an action against the city, mayor, and common council, the city assessor, clerk and attorney, challenging the validity of the election and seeking to enjoin the defendants from issuing or selling the bonds so voted. A like suit, raising the same issues, was commenced by A. L. Thomas and wife a few days later. The cases were consolidated at the trial. After hearing the evidence, the court entered judgment for defendants, and from such judgment plaintiffs McLoughlin and Robinson have appealed.

The parties have joined in asking us to advance the case, suggesting as reasons therefor the urgent necessity for the improvement and enlargement of the city's water system, and the availability of the fund to relieve unemployment in case the election should be upheld. For these reasons we have taken the case up out of its order.

There are two questions involved. One is as to whether the election was advertised according to law; and the other is as to whether the ballots were pre-

served and guarded in the manner provided by law, and, if not, the effect the departures had on the election.

The order for the election was made by the mayor and common council on July 6, 1931, and in it the date of the election was fixed for August 22, 1931. No objection has been made to the contents, form, or sufficiency of the order. This order was published in the "Prescott Courier," a daily newspaper published in the City of Prescott, on July 7th, 11th, 16th, 22d, 28th, August 1st, 6th, 16th, 17th and 21st, ten times, or for a period of forty-five days from the first to the last publication. Five copies of such order were posted in public places in said city for at least twelve days prior to the date of the election and one copy at the polling place where the election was held.

The City of Prescott is operating under a special charter granted it by the territorial legislature in 1883 (Act No. 37, page 66, Laws of Arizona 1883). Sections 21 and 25 of article 10 of said act of incorporation, which we think are the only provisions bearing on the question, read as follows:

"Sec. 21. In addition to what may be especially required by other provisions of this Act to be published, the following proceedings and acts of said municipal authorities shall be published in English by at least ten insertions in some newspaper printed and published in said city:

"First. All ordinances adopted in accordance with the provisions of this Act.

"Second. All resolutions of the Common Council required by this Act to be in writing."

"Sec. 25. Whenever the Common Council shall desire to make any improvements authorized by this Act, and to carry out such improvements find it necessary to issue bonds in excess of the amount authorized by section 3 (2), Article X of this Act, they shall give notice of the same to the taxpayers of said city by publishing in some paper published in said city for ten days.

"First. The proposed improvement.

"Second. The amount of bonds, time, interest and manner of issuance.

"Third. The day, hour and place where a special election shall be held."

Section 8 of article 9 of the Constitution limits the amount of the indebtedness that a county, city, town, school district or other municipal corporation may contract to four per centum of its taxable property without the assent of a majority of the property taxpayers, who are also qualified electors. In pursuance of such section the legislature, by chapter 2, title 52, Revised Statutes of 1913 (Civ. Code 1913, par. 5266 et seq.), carried forward as amended into the Revised Code of 1928 as sections 2657–2677, provided the method by which such taxing units might increase their indebtedness above the four per centum of the value of the taxable property therein. Section 2660, Revised Code of 1928, reads as follows:

"Said governing body or board shall cause to be posted at least five copies of such order [for election] in public places within the subdivision wherein such election is to be held, at least twelve days prior to the date of the election; post a copy of said notice at each polling place therein; and publish a copy thereof in some newspaper for at least thirty days prior to the date of such election. The election shall conform with the general election laws of the state; the return of said election in a county or school district election shall be made to the board of supervisors, and, in any other case, to the governing body or board of such subdivision, within twelve days from such election; whereupon the board of supervisors, governing body or board, shall hold a special meeting on the first Monday succeeding said twelfth day to canvass the vote cast and certify the result. The certificate of the result shall be *prima facie* evidence of the complete performance of all conditions and requirements precedent to the holding of such election. Said governing board or body shall file and

record in the office of the county recorder a certificate showing the object of such election, the total number of votes cast and the total number for and against the creation of such indebtedness, and stating that the creation of such indebtedness is ordered; and thereupon it shall carry out the object of such election.''

We think there can be no question but that this last legislation had the effect of repealing all those provisions of the act of 1883 (incorporating said city) concerning the publication of notice of an election, wherever there exists a conflict. In other words, the mayor and common council should have followed the provisions of section 2660, *supra,* in the matter of publishing notice of the election, instead of the provisions of its 1883 charter. That section provides that a copy of the order shall be published ''in some newspaper for at least thirty days prior to the date of such election.''. The sufficiency of a publication to meet this provision is defined by section 2747, Revised Code of 1928, as follows:

''When notice is provided by law to be given for a specified number of days, or weeks, if published in a daily paper, it must be published six days out of seven in a week; if published in a weekly paper, it must be published one day in each week, and one insertion per week in weekly papers and six insertions per week in daily papers shall constitute seven days' notice.''

It is quite clear that since the publication was in a daily paper it should have been published six days out of seven of each week during the period of thirty days in order to conform to the law. The statute, it will be noticed, makes publication in a weekly newspaper once a week for the required period of thirty days, or publication in a daily six times a week for the thirty days prior to the day of election, sufficient notice of the election. For the purpose of advising the voters of the election, it would seem that weekly

publications of a notice in a daily would be quite as effective as in a weekly. This is said, not for the purpose of holding that weekly publication in a daily satisfies the statute, but for the purpose of showing that the departure could have made the notice no less general or public than if the law had been strictly complied with.

The fact that an election would be held on August 22d could as well have been learned by the voters from a weekly publication in the daily as if published once a week for the period in a weekly paper.

We have held that the sole purpose of publishing notice of an election is to warn the electors that an election is to be held and that a substantial compliance with the statute is all that is required. *Hicks* v. *Krigbaum,* 13 Ariz. 237, 108 Pac. 482. We have restated this rule in one form or another in *Allen* v. *State,* 14 Ariz. 458, 44 L. R. A. (N. S.) 468, 130 Pac. 1114, *Findley* v. *Sorenson,* 35 Ariz. 265, 276 Pac. 843, and *McDonald* v. *Cochise County,* 37 Ariz. 90, 292 Pac. 603. In the latter case we said:

"A fair election and an honest return are paramount considerations as compared to minor requirements which prescribe the formal steps to reach that end."

The general rule is stated in 20 Corpus Juris 99, section 84, as follows:

"Substantial compliance with a statutory provision that notice of a coming election shall be published in one or more newspapers for a certain time before election day is all that is required; and an election which has been duly ordered will not be vitiated by a mere irregularity in the publication of the notice, or because the notice was not published for the required time, in the absence of a showing that the want of full notice deprived some portion of the electors of their right to vote, and that their votes would have changed, or rendered the result doubtful. . . . "

In *Ratliff* v. *State,* 79 Okl. 152, 191 Pac. 1038, the rule is stated to be:

"This court in a long line of cases has held that the notice in special elections is directory and not mandatory, and that a substantial compliance renders the election valid, and in the absence of allegations and proof that a sufficient number of voters were not notified of the election and did not actually participate therein to have changed the result, the election would not be held void."

*Seymour* v. *City of Tacoma,* 6 Wash. 427, 33 Pac. 1059, involved an issue of city bonds, and the question was as to whether, when the statute required the election notice to be published thirty days next preceding said election and that notice be posted for a like period, the election was void because the notices were posted only twenty-six days and published for thirty consecutive days, but not on the day preceding the election. After reviewing the facts and the law, the court said:

"The power was conferred upon the city to issue these bonds by the statute, with the limitation that a vote of the people should first be taken to see whether they consented; and, they having consented, no mere negligence of the clerk or the publisher should be allowed to defeat their will. In this connection, however, we would not have it understood otherwise than that officers ought, in all such matters, to follow the letter of the law governing them, whether they deem any particular requirement material or not. Our holding is only that where, as in this case, there was a substantial compliance with the law, and there was a fair election, the result cannot be defeated by technical irregularities."

We concur in the rule stated by the court in *Weisgerber* v. *Nez Perce County,* 33 Idaho 670, 197 Pac. 562, as follows:

"However, we are of the opinion that the correct rule, and the one supported by the great weight of

authority, may be stated as follows: Statutory directions as to the time and manner of giving notice of elections are mandatory upon the officers charged with the duty of calling the election, and will be upheld strictly in a direct action instituted before an election; but after an election has been held, such statutory requirements are directory, unless it appears that the failure to give notice for the full time specified by the statute has prevented electors from giving a full and free expression of their will at the election, or unless the statute contains a further provision, the necessary effect of which is that failure to give notice for the statutory time will render the election void."

See, also, *Sizemore* v. *Board of Commrs.*, 36 Idaho 184, 210 Pac. 137; *King* v. *Independent School Dist., Class A, No. 37,* 46 Idaho 800, 272 Pac. 507; *In re Validation of East Bay Mun. Util. Dist. Water Bonds,* 196 Cal. 725, 239 Pac. 38.

This, in effect, is the rule announced in *Allen* v. *State, supra,* wherein we said:

"Consummated or completed acts we will not annul for reasons that might have possessed merit, if urged at the proper time."

In that opinion we quoted from the opinion of Mr. Justice BREWER in *Prohibitory Amendment Cases,* 24 Kan. 700, as follows:

"After the contest was ended and the election over, the claim is for the first time made that after all there was nothing in fact before the people; that this whole canvass, excitement, and struggle was simply a stupendous farce, meaning nothing, accomplishing nothing. This is a government of the people, by the people, and for the people. This court has again and again recognized the doctrine, lying at the foundation of popular governments, that in elections the will of the majority controls, and that mere irregularities or informalities in the conduct of an election are impotent to thwart the expressed will of such majority."

We have stated the applicable law. We will now turn to the facts.

The trial court found as facts that the question of the city's improvement of its water system had been a matter of concern to the residents and taxpayers of the city for a number of years prior to July 6th; that it had been a subject of discussion in the civic organizations and in the newspapers, and that the city, through its officers, had carried on investigations concerning it for at least ten years; that following July 6th keen interest and public discussion continued; that there were groups advocating the approval of the bond issue and groups opposing such approval; that these opposing groups interested themselves to get the vote out on August 22d; that during the period of publication many articles appeared in the local papers as to the advisability and inadvisability of voting the bonds. One of the court's findings was in this language:

"I further find from the evidence that no person voted at said election who was not a qualified elector and real property taxpayer in the City of Prescott, and I further find that no person was prevented from voting at said election who was a qualified elector and real property taxpayer, and that no person qualified to vote failed to vote by reason of lack of notice of said election."

That the evidence fully supports these findings is not questioned. Indeed, the plaintiffs in their complaint make no charge that anyone was prevented from voting by reason of a failure strictly to comply with the law in regard to publishing notice. In such circumstances, why should the election be held void unless we are compelled to follow the letter of the law instead of its spirit? We find many precedents in this and other jurisdictions that amply justify us in holding, indeed require us to hold, the election valid.

Section 2660, *supra*, provides that the elections therein mentioned shall conform with the general election laws of the state. One of the provisions of the general election law, found in section 1228, Revised Code of 1928, reads as follows:

"The ballots, as soon as read, or rejected for illegality, shall be strung, those allowed on one string and those rejected on another, and shall not thereafter be examined by any person. Each ballot rejected shall be marked 'rejected,' and the cause of the rejection indorsed on the back thereof and signed by a majority of the board. All ballots shall, as soon as the counting is completed, be tied with the string on which they are strung and carefully sealed in a strong envelope, to be provided for the purpose, each member of the board writing his name across the seal."

It is claimed that, because the members of the board of election did not place ballots on strings and seal them in an envelope and write their names across the seal, and because a rejected ballot was not marked and indorsed as provided, the election should be declared void.

The court found as a fact that the ballots from the day of election until they were brought into court on October 1, 1931, had been carefully guarded and kept in ballot-box under lock and key and in the safe office of the city hall, and had not been tampered with, but were in the same condition on October 1st as at the close of the election on August 22d. The court found that 627 persons voted; that 425 legal ballots were cast for the bonds and 201 legal ballots were cast against the bonds, and that one ballot marked "Yes" was rejected because the voter had failed to make his cross opposite thereto. In *Averyt* v. *Williams*, 8 Ariz. 355, 76 Pac. 463, the effect of not preserving ballots according to the terms of a

statute similar to section 1228, *supra,* was passed upon, and the court there said:

"The object of the election law is to prevent fraud, and to guaranty to the voter the registration and count of his ballot. A construction of the statute that would render it impossible to ascertain the will of the voter as expressed by his ballot, without fault on his part, and would make that ballot inadmissible in evidence solely because of the action of the election officials in failing to comply with certain of the requirements of the statute in respect to the manner of preservation of the ballots, would make it possible for such officers to nullify the will of the voter, or of any number of voters, by a simple departure from some of the requirements of the statute, and would tend to defeat the object of the law. We think that where the requirements of the statute with respect to the method of preservation of the ballots have not been complied with, the object of the statute, to give effect to the expression of the will of the voter, is best subserved by holding that such noncompliance does not necessarily make the ballots inadmissible in evidence, but the burden of proof in such case is cast upon the party offering to introduce them in evidence to show that the ballots offered are the identical ballots cast at the election, and that there is no reasonable probability that the ballots have been disturbed or tampered with; and, if it appears that the ballots are before the court in their integrity, they should be admitted in evidence. The question as to the preservation of the ballots in their integrity is a question of fact to be determined by the trial court as other questions of fact, and the finding thereon is to be reviewed by this court as are findings on other similar questions of fact." See, also, *Findley* v. *Sorenson, supra;* 20 C. J. 198, § 250.

It is apparent that the election itself is the controlling feature and ultimate objective of the statute. If the election has been honestly and fairly conducted and no one has been injured by the manner in which the preliminary steps leading thereto have been taken, or by the manner in which the ballots were preserved,

no reason exists for declaring it invalid. Such we believe to be the situation here.

The judgment is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.