857 P.2d 1308

Linda Lou MILLER, Ray Franklin Miller, George Luther Tallent, Margaret Lucille Tallent, Leonor F. Martan, Emil Keith Martan, Anita Rose Martan, Ronald Francis Pugliese, Kathleen Miller Parmeter, Cathleen Harris, Murrel Harris, Virginia Frances Beard, Plaintiffs/Appellees,

v.

PICACHO ELEMENTARY SCHOOL DISTRICT # 33, Superintendent Robert C. Noe, Governing Board President Abel Garza, Defendants/Appellants.

No. 2 CA–CV 92–0097.

Court of Appeals of Arizona, Division 2, Department B.

March 16, 1993.

Reconsideration Denied April 21, 1993.

Review Granted Sept. 21, 1993.

Linda Lou Miller, Ray Franklin Miller, George Luther Tallent, Margaret Lucille Tallent, Leonor F. Martan, Emil Keith Martan, Anita Rose Martan, Ronald Francis Pugliese, Kathleen Miller Parmeter, Cathleen Harris, Murrel Harris and Virginia Frances Beard, in pro. per.

Roy A. Mendoza, Pinal County Atty. by Linda L. Harant, Florence, for defendants/appellants.

## OPINION

DRUKE, Presiding Judge.

Appellants appeal from the order of the trial court setting aside the result of a budget override election after that result was contested by appellees. Because this appeal from an election contest presents mixed questions of fact and law, our review is de novo. *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47 (1966). We reverse based upon the following facts and the law in this jurisdiction for determining election contests.

In November 1991, Picacho Elementary School District # 33 voted to hold a budget override election pursuant to A.R.S. § 15–481(A). This statute requires such an election "[i]f the proposed budget of a school district includes an increase of more than the aggregate budget limit for the budget year...." The election was held on February 11, 1992, with 47 absentee ballots being cast pursuant to A.R.S. § 15–402 and A.R.S. § 16–541 through 16–552. Six were rejected by the elections board pursuant to A.R.S. § 16–552, but they are not in issue here; only the remaining 41 ballots are. They all favored the override and were contested by appellees because none of the absentee ballots were mailed to the electors as required by A.R.S. § 16–542(B). The absentee ballots either were obtained by the electors at the District office or were delivered to the electors by District personnel. This, appellees alleged, constituted misconduct by the District. *See* A.R.S. § 16–672(A)(1).

The trial court conducted an election contest hearing as required by A.R.S. § 16–676, and set aside the override election based upon the following findings:

The Court finds that there were many irregularities in the [District's] override election. None of the absentee ballots were mailed pursuant to A.R.S. § 16–542(B). Numerous representatives and employees of the ... District utilized personal delivery, violating the provision of the aforementioned section providing that only the elector may be in possession of that elector's unvoted absentee ballot either at his place of residence or in a location where he is temporarily residing.

\* \* \* \* \* \*

The statute is clear and precise as to mailing. Forty-one absentee votes were acquired by irregular techniques in violation of A.R.S. § 16–542(B). The forty-one irregular ballots made the difference in the election and are hereby voided.

The issue, therefore, is whether all 41 absentee ballots are invalid under Arizona law because they were not mailed to the electors as required by A.R.S. § 16–542(B).

This precise issue has not been decided previously in Arizona. Where it has been decided, there is a split of authority. Some courts have done as the trial court did in this case and voided all improperly delivered ballots because the mere opportunity to commit fraud, whether actually committed or intended, required it. *Petition of Byron*, 165 N.J.Super. 468, 398 A.2d 599 (Law Div.1978), *aff'd*, 170 N.J.Super. 410, 406 A.2d 982 (App.Div.1979); *May v. Wilson*, 199 S.C. 354, 19 S.E.2d 467 (1942); *Clark v. Quick*, 377 Ill. 424, 36 N.E.2d 563 (1941); *Larson v. Locken*, 262 N.W.2d 752 (S.D.1978); *Parra v. Harvey*, 89 So.2d 870 (Fla.1956); *Spradley v. Bailey*, 292 So.2d 27 (Fla.App.), *cert. denied*, 296 So.2d 51 (Fla.1974).

Other courts, however, have refused to void the improperly delivered ballots, and thereby disenfranchise those electors, unless actual fraud is shown. *In Matter of Rodriguez*, 558 S.W.2d 356 (Mo.App.1977); *Mahaffey v. Gill*, 459 S.W.2d 919 (Tex.Civ. App.1970); *Sommerfeld v. Board of Canvassers of City of St. Francis*, 269 Wis. 299, 69 N.W.2d 235 (1955); *Lanser v. Koconis*, 62 Wis.2d 86, 214 N.W.2d 425 (1974). We adopt the holding of these cases because we believe it is consistent with the prior case law of this jurisdiction.

■ In Arizona, the guiding principle for determining an election contest is to effectuate the will of the voters. This principle was adopted before statehood in *Territory ex rel. Sherman v. Board of Supervisors of Mohave County*, 2 Ariz. 248, 253, 12 P. 730, 732 (1887) ("It is the object of elections to ascertain a free expression of the will of the voters ..."). *See also Abbey v. Green*, 28 Ariz. 53, 235 P. 150 (1925) (foundation of popular governments is that will of majority controls in elections). Concomitant with this principle, our supreme court has enunciated the following cardinal rule for governing election contests:

> [G]eneral statutes directing the mode of proceeding by election officers are deemed advisory, so that strict compliance with their provisions is not indispensable to the validity of the proceedings themselves, and that honest mis-takes or mere omissions on the part of election officers, or irregularities in directory matters, even though gross, *if not fraudulent*, will not void an election, unless they affect the result, or at least render it uncertain.

*Findley v. Sorenson*, 35 Ariz. 265, 269, 276 P. 843, 844 (1929) (emphasis added). *See also McLoughlin v. City of Prescott*, 39 Ariz. 286, 6 P.2d 50 (1931); *Chenoweth v. Earhart*, 14 Ariz. 278, 127 P. 748 (1912); *Moore v. City of Page*, 148 Ariz. 151, 713 P.2d 813 (App.1986). This cardinal rule, our supreme court has observed, is founded upon good reason; without it, election officials could "nullify the will of the voter, or of any number of voters, by a simple departure from some of the requirements of the statute, and would tend to defeat the object of the law." *Averyt v. Williams*, 8 Ariz. 355, 359, 76 P. 463, 464 (1904).

■ Here, the evidence is undisputed that the District departed from the mailing requirement for absentee ballots. They either were given to electors at the District office or were delivered to their homes. There is also evidence that when some District personnel provided the absentee ballots, the electors were encouraged to vote in favor of the budget override. However, contrary to the dissent's presumption from the 41 "yes" votes, there is no evidence that such encouragement in fact influenced any of the absentee electors to vote other than they intended, with one possible exception.

Four electors who voted absentee testified at the hearing. The ballots of all four were delivered to them at their homes by District personnel. Three testified that their votes were unaffected by such delivery: Anna Jaimes unequivocally stated, "it was my vote, my opinion, my decision"; Arturo Flores testified that he voted "because I wanted to vote"; and Alberto Flores answered "yes" when asked by the court, "And did you vote the way you wanted to vote?" Only William Huddleston testified ambiguously on this issue. On direct examination by appellees, he stated:

Q. All right. When [the District personnel] brought the ballot to you, did they ask for your support?

A. Yes.

Q. All right. And did they watch you vote?

A. Oh, yeah.

Q. All right.

A. They told me more or less in one way that we need this vote for this, you know. And then she made a statement like something to the effect we can't tell you how to vote, but we wish you would do this.

When asked on cross-examination by the District if he had voted the way he wanted, Huddleston said:

A. I don't really know. I don't know the whole pro and cons is the thing, you know. I kind of voted one way because my kids would come home and say, "Dad, you got to do this; [D]ad, you got to do this, this is what's going to happen." I just knew one side of it, I guess you might say, and pressure from my kids and then these people calling me saying we need this, we need this. I never heard anybody say we don't need this. That's kind of how I voted, you know, and why.

\* \* \* \* \* \*

Q. So you voted—What you marked on the ballot was what you wanted to mark on the ballot?

A. Right.

Consequently, at best, appellees were only able to show that one absentee elector, Huddleston, may have been fraudulently influenced by the fact that his ballot was delivered, rather than mailed. That one vote, however, is insufficient to affect the result. The trial court found that there were 85 "no" votes and 60 "yes" votes without the 41 absentee ballots. With those ballots, there would be 101 "yes" votes for the override, or a margin of 15 "yes" votes even without Huddleston's ballot.

It is thus apparent that appellees failed to show that the irregularities in the District's handling of the absentee ballots affected the result. *Morgan v. Board of Supervisors*, 67 Ariz. 133, 192 P.2d 236 (1948); *Moore v. City of Page, supra*. In that regard, this case is indistinguishable from *Findley v. Sorenson*. There, only one candidate's name was printed on the ballot; the other candidate's name was written on the ballot by the election officers just before it was handed to the voter. Although our supreme court condemned this conduct "because it might be construed as undue interest on the part of the election officers in the election," 35 Ariz. at 271, 276 P. at 845, the court nevertheless concluded:

[U]nless it appears that such conduct did as a matter of fact illegally affect the result of the election, we think that … the vote of the precinct should not be rejected for that cause alone. The mere writing in of the name of [the candidate] by the board in and of itself would not permit the ballot to be legally counted for him. It must in addition be marked in such manner as to indicate the intent of the voter, and if this was so done by the voter himself after the ballot was given him, the conduct of the election board, though irregular, was harmless.

*Id.*

Similarly, in *McLoughlin v. City of Prescott*, the court rejected the claim that the election should be declared void because the election board did not follow the statutory procedure of placing the ballots on strings, sealing them in an envelope, and writing their names across the seal. The court held that "[i]f the election has been honestly and fairly conducted and no one has been injured by the manner in which the preliminary steps leading thereto have been taken, or by the manner in which the ballots were preserved, no reason exists for declaring it invalid." 39 Ariz. at 297–98, 6 P.2d at 54.

Invalidation is mandatory, however, only when statutorily prescribed. In the words of the *Findley* court, "[I]f the statute expressly provides that a failure to observe certain requirements invalidates the vote, the court can do nothing but

enforce the law as it is...." 35 Ariz. at 270, 276 P. at 844. *See also McLoughlin v. City of Prescott, supra; Moore v. City of Page, supra.* Here, there is nothing to enforce. No statute of which we are aware expressly provides for the invalidation of an absentee ballot which is not mailed to the elector, including A.R.S. § 16–542(B) upon which appellees rely. The relevant portion of that provision simply states:

Only the elector may be in possession of that elector's unvoted absentee ballot, either at his place of residence or at a location where he is temporarily residing while absent from his precinct.

Whatever the intended purpose of this provision may be, it contains no express language which would require invalidation of the 41 absentee ballots in this case. We believe this is a matter to be addressed legislatively and not judicially as the dissent advocates.

Accordingly, we reverse the order of the trial court setting aside the District's override election conducted on February 11, 1992, and that election is confirmed.

FERNANDEZ, J., concurs.

HATHAWAY, Judge, dissenting.

The trial court's factual finding of "many irregularities in the override election" is supported by the record and the court's voiding the absentee ballots, I believe, was appropriate. A.R.S. § 16–542 states in relevant part:

B. The recorder or other officer in charge of elections *shall mail* postage prepaid to the requesting elector the absentee ballot ... pursuant to § 16–545. Only the elector may be in possession of that elector's unvoted absentee ballot, either at his place of residence or at a

location where he is temporarily residing while absent from his precinct.
(Emphasis added.)

As noted by the majority, our supreme court has enunciated the following cardinal rule governing election contests:

[G]eneral statutes directing the mode of proceeding by election officers are deemed advisory ... *unless they affect the result,* or at least render it uncertain.

*Findley v. Sorenson,* 35 Ariz. 265, 269, 276 P. 843, 844 (1929) (emphasis added). The majority acknowledges the trial court found that: "The statute is clear and precise as to mailing. Forty-one absentee votes were acquired by irregular techniques in violation of A.R.S. § 16–542(B). The forty-one irregular ballots made the difference in the election and are hereby voided."

The majority seems to believe that the trial court had to find the votes obtained irregularly were "fraudulent." I believe the trial court's conclusion that the election "result" was affected by the irregular ballots is sufficient. *Findley* expressed concern where results were involved. 35 Ariz. at 269, 276 P. at 844. The trial court's determination as fact finder that the irregular absentee ballots "affect[ed] the result" of the election is supported in the record and should not be disturbed. *Paul Schoonover, Inc. v. Ram Const., Inc.,* 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981); *Yano v. Yano,* 144 Ariz. 382, 384, 697 P.2d 1132, 1134 (App.1985).

Violation of the statutory provisions for absentee ballot delivery by "[n]umerous representatives and employees of the ... District" in utilizing personal delivery [1] afforded inordinate opportunity for undue influence and abuse circumventing fair elections reflecting the will of the people. The insider influence by District representatives disregarding mandatory statutory provisions calculated to protect the purity of the election clearly registered its impact

---

1. A.R.S. § 16–1016(7) proscribes as a class 5 felony acts by a person who "knowingly and unlawfully ... removes a ... ballot ... from possession of the person authorized by law to have custody thereof." A.R.S. § 16–1018(5) proscribes as a class 2 misdemeanor acts by a person who "[k]nowingly ... receives from a voter a ballot prepared for voting, unless he is an election official."

in the results—all 41 absentee votes were "yes." Without the absentee votes the override was losing with 85 "no" votes and 60 "yes" votes.

Linda Lou Miller, clerk of the school district governing board, and co-appellee, along with 11 district residents, recognized the impropriety of the situation and filed the election contest petition. It was further brought out at trial that the superintendent of the school district had offered school employees $1,000 raises if they helped to get the override passed.[2]

Ballots cast in violation of statutes safeguarding the free and fair expression of the will of electors from undue influence or intimidation, "affects the freedom and purity of the ballot to exactly the same extent as a ballot tainted with actual fraud.... Violations of those statutes, such as the absentee voting statutes, present the opportunity for fraud, whether committed or intended." *Emery v. Robertson County Election Comm'n*, 586 S.W.2d 103, 109 (Tenn.1979).

The official application for an absentee ballot is initiated by a "signed request" from the elector. Once requested, the "recorder or other officer in charge of elections *shall mail* postage prepaid to the requesting elector the absentee ballot...." A.R.S. § 16–542(B) (emphasis added). Invalidation of tainted ballots which do not follow this statute is the implicit remedy and the one appropriately invoked by the trial court. The record amply supports the trial court's factual findings.

There is a close connection between the statutory delivery requirements and legislative concerns about fraud and secrecy. Fraud, in particular, is difficult to prove. The purpose of our statutes is to prevent fraud and preserve secrecy through strict procedural controls. A violation of these *procedures*, therefore, becomes very significant.

\* \* \* \* \* \*

In short, two of the vital concerns of the Legislature in enacting absentee voting legislation—preservation of the secrecy of the ballot and prevention of fraud— were placed in jeopardy by the procedure adopted in these cases. The importance of vindicating these interests outweighs any countervailing concern over the disenfranchisement of voters.... [T]he court has concluded that the intent of the Legislature will best be served by voiding the ballots.

*Petition of Byron,* 165 N.J.Super. 468, 475–76, 398 A.2d 599, 603 (Law Div.1978), *aff'd,* 170 N.J.Super. 410, 406 A.2d 982 (App.Div.1979) (emphasis in original).

All votes turned in favored the override. In addition to the concern for the selective and personal delivery of absentee ballots by those charged with impartially making them available, the method employed runs the risk of "the loss" (perhaps with a wink and a nod) of unfavorable, unsealed ballots. The foregoing statutes criminalizing behaviors not conforming to A.R.S. § 16–542 underscore the importance the legislature places upon compliance. The record discloses absentee ballots were presented to electors and retrieved unsealed by unauthorized solicitors with a vested interest in the election outcome. This goes beyond normal electioneering within legal parameters as a recognized and accepted part of the democratic process.

The majority notes, and I agree, that no mere "irregularity" should invalidate an election. However, statutory safeguards calculated to insulate against illegal and out-of-bounds trafficking in absentee ballots is no mere "irregularity." The absentee vote violated those fundamental safeguards; to also require a showing of actual

---

**2.** A.R.S. § 16–1014(A), corruption of electors, proscribes as a class 2 misdemeanor, acts by a person who (1) offers or promises "money or other valuable considerations ... to or for any other person to induce the voter to vote ... for any particular ... measure ..." and "(3) receive[s], agree[s], or contract[s] for, before, dur- ing, or after an election provided by law, money, gifts, loans, or other valuable consideration, office, place or employment ... for voting or agreeing to vote ... or for inducing any person to vote or refrain from voting, or to vote or refrain from voting for a particular person or measure at an election."

fraud in each of those "out-of-bounds absentee votes" effectively writes out of the law the preventive defensive shields mandated by the legislature to help keep Arizona elections honest reflections of the free and fair will of the people. Here, reversal of the trial court's ruling ignores egregious, slipshod absentee balloting practice filching the election and rewards the statute's violators.

I would affirm the trial court; therefore, I respectfully dissent.