[Civil No. 3820. Filed December 1, 1936.]

[62 Pac. (2d) 1131.]

JAMES H. KERBY, as Secretary of State of the State of Arizona, et al., Appellants, v. A. J. GRIFFIN, Appellee.*

---

*Judgment rendered October 8, 1936.

Mr. John L. Sullivan, Attorney General, and Mr. Elmer C. Coker, Assistant Attorney General, for Appellants.

Mr. R. N. Campbell, for Appellee.

LOCKWOOD, C. J.—A. J. Griffin, hereinafter called plaintiff, brought suit in the superior court of Maricopa county against James H. Kerby as Secretary of the State of Arizona, hereinafter called defendant, and against the clerks of the boards of supervisors of each and every county in the state of Arizona, asking that defendant Kerby be enjoined from certifying to any of the clerks aforesaid any number or form of ballot title for a certain initiative petition which had been filed with him, proposing to submit to the voters a certain law which we shall hereinafter call the school law, and from distributing and furnishing to the clerks or the voters of the state certain publicity pamphlets to which we shall hereinafter refer, and that the clerks be enjoined from causing to be printed on the ballot for the general election any number or ballot title for said school law, or from distributing to the voters any of the said publicity pamphlets. The trial court issued a temporary restraining order, and, upon hearing, granted a permanent injunction as prayed for, and this appeal is from the permanent injunction so granted.

The facts of the case, so far as material to its decision, may be stated as follows. When the Constitution of Arizona was adopted in 1910, it contained the following provisions:

"Article 4, § 1, subd. (1). The legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives, but the people reserve the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature. . . .

"(9) Every Initiative or Referendum petition shall be addressed to the Secretary of State in the case of petitions for or on State measures, and to the clerk of the Board of Supervisors, city clerk, or corresponding officer in the case of petitions for or on county, city, or town measures; and shall contain the declaration of each petitioner, for himself, that he is a qualified elector of the State (and in the case of petitions for or on city, town, or county, measures, of the city, town, or county affected), his post office address, the street and number, if any, of his residence, and the date on which he signed such petition. Each sheet containing petitioners' signatures shall be attached to a full and correct copy of the title and text of the measure so proposed to be initiated or referred to the people, and every sheet of every such petition containing signatures shall be verified by the affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet was signed in the presence of the affiant and that in the belief of the affiant each signer was a qualified elector of the State, or in the case of a city, town, or county measure, of the city, town, or county affected by the measure so proposed to be initiated or referred to the people.

"(10) When any Initiative or Referendum petition or any measure referred to the people by the Legislature shall be filed, in accordance with this section, with the Secretary of State, he shall cause to be printed on the official ballot at the next regular general election the title and number of said measure, together with the words 'Yes' and 'No' in such manner that the electors may express at the polls their approval or disapproval of the measure.

"(11) The text of all measures to be submitted shall be published as proposed amendments to the Constitution are published, and in submitting such measures and proposed amendments the Secretary of State and all other officers shall be guided by the general law until legislation shall be especially provided therefor."

"Article XXI. *Mode of Amending.* Section 1. Any amendment or amendments to this Constitution may be proposed in either House of the Legislature,

or by Initiative Petition signed by a number of qualified electors equal to fifteen per centum of the total number of votes for all candidates for Governor at the last preceding general election. . . . Until a method of publicity is otherwise provided by law the Secretary of State shall have such proposed amendment or amendments published for a period of at least ninety days previous to the date of said election in at least one newspaper in every county of the State in which a newspaper shall be published, in such manner as may be prescribed by law.''

In pursuance of the provisions of article 21, *supra*, the legislature in 1912 provided a method of publicity in lieu of that set forth in the article, which was carried forward in substance as section 1746, Revised Code of 1928.

This section reads, in part, as follows:

''*Publicity; pamphlets.* Not later than the first Monday of the third month next before any regular general election, nor later than thirty days before any special election, at which an initiative or referendum or amendment to the constitution is to be submitted to the people, the secretary of state shall cause to be printed in pamphlet form a true copy of the title and text of each measure to be submitted, with the number and form in which the ballot title thereof will be printed on the official ballot. . . . Any person may file with the secretary of state, for printing and distribution, an argument opposing any measure, or proposed constitutional amendment, not later than the fourth Monday of the fourth month immediately preceding such election. Arguments advocating or opposing any measures, referred to the people may be filed within the same time, but may be filed by any person or organization; arguments in support of a measure or proposed amendment submitted at a special election must be filed at least sixty days before such election. . . . The secretary shall print each of said arguments in the pamphlet copy of the measures and proposed constitutional amendments; all such measures and amendments and arguments to be submitted at one election shall be bound together in a

single pamphlet. . . . Not later than the fifty-fifth day before the regular general election at which the measures or amendments are to be voted upon, the secretary of state shall transmit by mail, postage prepaid, to every voter in the state whose address he may have, one copy of such pamphlet, and shall continue the mailing as the names are received from the county recorders, until all registered voters have been supplied with a copy."

In 1935, the legislature, being dissatisfied for some reason with the method of publicity provided by section 1746, aforesaid, adopted chapter 62 of the Regular Session Laws of that year, which amended section 1746, *supra*, materially in regard to the time and method in which the publicity pamphlets provided for in that section should be distributed. The section as amended by chapter 62 reads, so far as material, as follows:

"Section 1. (Sec. 1746.) *Publicity Pamphlet; Printing; Distribution.* (a) Whenever the secretary of state is ordered, by the legislature or by petition, under the initiative and referendum provisions of the constitution, to submit to the people any measure or proposed amendment to the constitution, he shall cause to be printed, at the expense of the state, except as hereinafter provided, a publicity pamphlet, which shall contain: (1) a true copy of the title and text of such measure or proposed amendment; (2) the form in which the said measure or proposed amendment will appear on the ballot and the number by which it will be designated; (3) the arguments for and against the said measure or amendment.

"(b) Not later than the tenth day before the primary election the secretary of state shall cause to be delivered to the board of supervisors of each county a quantity of such publicity pamphlets equal to the number of registered voters in each county, according to information which shall be supplied to the secretary of state by the several county recorders immediately upon the closing of registration prior to said primary election; and with the election supplies directed by law

to be sent to the voting precincts in each county there shall be sent a quantity of publicity pamphlets equal to the number of registered voters in said voting precincts respectively.

"(c) It shall be the duty of the election board, at said primary election, to offer one copy of said publicity pamphlet to each elector applying to vote, and to return to the board of supervisors, with the returns of said primary election, all copies thereof not so presented to voters. The board of supervisors shall immediately deliver the said copies to the county recorder, who shall offer one thereof to each person who appears to register prior to the general election. The county recorder shall also provide the several registration officers in his county with a proper supply of publicity pamphlets, and instruct them in their use.

"(d) The person filing an initiative petition, and no other, may at the same time file with the secretary of state an argument advocating the measure or constitutional amendment proposed in said petition. Not later than forty-five days preceding the regular primary election any person may file with the secretary of state an argument advocating or opposing any measure with respect to which the referendum has been invoked. Each such argument shall be signed by the person sponsoring the same, or if the same is sponsored by an organization, it shall be signed by the officers thereof."

This act was declared to be an emergency measure and took effect the 21st day of March, 1935. On the 3d day of July, 1936, there was filed with the defendant Kerby a certain petition (in the form set forth by the Constitution, and purporting to be signed by the proper number of qualified electors), asking that the amendment to the statutes which we have referred to as the school law be submitted at the general election to be held November 3, 1936. Immediately upon such petition being filed with the defendant, he assigned a number to it and formulated a ballot title therefor. He did not, however, have printed and distributed to the

boards of supervisors of the state at any time before the primary election, which was to be held on September 8th, any publicity pamphlets whatever, as provided by chapter 62, and of course none could be or were offered to the electors appearing at said primary, by the election officers. Shortly after the primary this action was brought, the ground being that the publicity provisions of chapter 62, *supra,* had not been and could not then be complied with, and that the school law, for that reason, should not appear upon the ballot. Kerby appeared and demurred to the complaint, raising some five objections thereto, which were overruled by the court, and then answered, admitting that he had not caused the publicity pamphlets to be printed nor distributed according to the provisions of chapter 62, *supra,* and gave as an excuse therefor that such chapter was void, unconstitutional, and of no effect, for the reason that its provisions could not be carried out within the time set forth therein, giving many reasons why the time was too short, which we shall discuss more particularly hereinafter. He then alleged that he did cause pamphlets to be printed in accordance with the provisions of original section 1746, which were delivered to him on the 24th of September, and that he was about to cause them to be mailed to the voters, under the provisions of the original section, but that the auditor had refused to approve claims for the expense of such mailing, and that it was, therefore, impossible for him to mail them out according to the provisions of the section, but that had she approved the claims, he could and would have mailed to each of the voters of the state one of the pamphlets before November 3d, and could and would still do so if permitted. The plaintiff demurred to the answer as not setting up a defense to the petition, and the demurrer was sustained by the trial court and, Kerby not amend-

ing his answer, the injunction was made permanent, whereupon the matter came before us on this appeal.

Certain questions of law which we must first consider were raised by defendant's demurrer to the complaint. One of these was whether the court had any jurisdiction of the subject-matter of the action. Defendant's theory is that the people, acting through the initiative, are as truly a part of the lawmaking power of the state as is the legislature when it is in session, and that the courts will no more undertake to control by injunction steps in the enactment of legislation by the people than they would in the enactment of legislation by the legislature, and that while *after* the people have acted under an initiative petition, if the validity of their act is then called in question, the courts will and can pass upon the validity if the question be raised in a proper case; they will not enjoin the submission of a measure to the people any more than they would undertake to enjoin a roll call in the legislature. In support of this position, defendant cites, among others, the cases of *Cress* v. *Estes,* 43 Okl. 213, 142 Pac. 411; *McAlister* v. *State,* 95 Okl. 200, 219 Pac. 134, 33 A. L. R. 1370; *In re Initiative Petitions,* 153 Okl. 205, 6 Pac. (2d) 703, 704. The reasoning of the cases cited, as well as others which adopt the same theory, is best set forth in the following language from the case last named:

"I am of the opinion that this court, and its existence as a court, depends upon the will of the people in this state. We are not masters and cannot control, nor deny the people the right to vote, nor have we jurisdiction or authority over matters of a purely political nature. . . .

"Under this section of the Constitution, it is an inhibition against this court to attempt in any way, either directly or indirectly, to interfere with the rights of the people. This Constitution is binding on this court. We must not assume that the Supreme

Court is the supreme power in the state of Oklahoma. The people are the supreme power. *We cannot say to the citizens when they shall vote and when they shall not vote.''* (Italics ours.)

These statements of constitutional principles are of course elementary and cannot be questioned, but we think the conclusion drawn therefrom by the Oklahoma Supreme Court and contended for by the defendant in this proceeding is a *non sequitur*. It is doubtless true that the courts, as well as every. other agency which assists in the administration of the government of this state, depend upon the will of the sovereign people of the state and none of the officers chosen to administer the government may interfere with or limit the rights of the sovereign. To this doctrine we subscribe unhesitatingly and wholeheartedly. We think, however, that defendant in attempting to apply that doctrine to the present situation overlooks one vital point. Our duty and our privilege is to carry out the will of the people. We hear many clamorous voices raised by different groups, blocs, and organizations, each claiming to be the true representative of that will. In the midst of all these discordant voices, where can we ascertain what it is, for the famous ·tailors of Toohey Street when they said, ''We, the people of England'' did not thereby become the people. The answer is simple, plain, and positive. That will is found in the Constitution adopted by the people of the state, and in the legislation enacted by virtue of that Constitution. There, and there only, is the true will of the whole people expressed, and there, and there only, do we turn when we attempt to ascertain and declare that will. When, therefore, a matter comes before this court, and it is urged that we have no jurisdiction nor authority to deny to the people the right to vote, we answer by saying that we never arrogate to ourselves

such authority. We merely look to the places where the people themselves have declared under what circumstances they will vote, and follow that declaration. And, indeed, it seems to us that to hold a court of equity could not intervene to prevent an election being held, when every constitutional and statutory provision setting forth what must be done before holding a legal election had been violated, would result in an absurdity. It has been frequently determined that if parties allow an election to proceed in violation of the law which prescribes the manner in which it shall be held, they may not, after the people have voted, then question the procedure. *Allen* v. *State*, 14 Ariz. 458, 130 Pac. 1114, 44 L. R. A. (N. S.) 468; *McLoughlin* v. *City of Prescott*, 39 Ariz. 286, 6 Pac. (2d) 50; *Abbey* v. *Green*, 28 Ariz. 53, 235 Pac. 150; Prohibitory Amendment Cases, 24 Kan. 700. If, then, they may not question the procedure before the election because it is an interference with the will of the people, and may not question it afterwards because it is then too late, when may the question be raised? Such a holding would be a travesty of the mandatory provisions of the Constitution and the acts of the legislature, for it would mean that they cannot be questioned at all. In the case of *Barth* v. *White*, 40 Ariz. 548, 14 Pac. (2d) 743, 745, it was sought to enjoin the Secretary of State from placing a certain constitutional amendment upon the ballot, and we reaffirmed the rule laid down in the Allen case, *supra*, saying:

"It is true that the statement made therein was not absolutely essential to the decision of the case, which was based specifically on the ground that objections of this nature must be raised before a referendum was adopted by the people and not after. We are nevertheless of the opinion that the rule laid down in the Allen Case is correct. We can see no reason why the interest of a citizen may not be as great in preventing an initiative petition not legally sufficient from

being submitted to a vote as in compelling that one legally sufficient should be so submitted.''

It is suggested that in this case we also said, ''Nothing further is required to make it the duty of defendant [secretary of state] to place the proposed amendment on the ballot'' and that this is, in effect, a statement that the court lacked jurisdiction to enjoin the submission of the measure to the voters. The fallacy of this reasoning is shown by the fact that the court in that case considered carefully the same jurisdictional question raised herein, and in its unanimous opinion expressly held that it did have jurisdiction to hear and determine the matter on its merits, and proceeded to do so. Had any question as to the sufficiency of notice or of the distribution of the publicity pamphlets appeared in the case, the quotation would have been in point on the merits, but those matters were in no manner raised by the pleadings nor an issue in the case, and, as we stated expressly in the opinion, we considered only the issues raised by the record. To contend the language quoted applied to an issue never raised, is not in harmony with the universal rule.

The same situation was before us in the case of *Kerby* v. *Luhrs,* 44 Ariz. 208, 36 Pac. (2d) 549, 94 A. L. R. 1502, and again we unanimously enjoined an initiated constitutional amendment from being placed on the ballot, on the ground that it violated the provisions of the Constitution. We think, therefore, both on sound reason and upon the unanimous decisions of our own court, that when it appears affirmatively the constitutional and statutory rules in regard to the manner in which initiative and referendum petitions should be submitted have been so far violated that there has been no substantial compliance therewith, that the courts have jurisdiction to enjoin the election at the suit of an interested citizen. This conclusion

is in harmonw with common sense. Any contrary decision would require us to say,

"It is true that the proposed initiative will not be submitted in accordance with the mandatory provisions of the constitution and statutes; it is also true that the procedure may not be questioned after the election. We will, nevertheless, refuse to allow it to be questioned before the election, and thus nullify the provisions of the constitution."

Of course were there any possibility that the constitutional and statutory provisions *could* be complied with to such an extent that the initiative, if approved by the people, would be a valid law, the injunction should be denied. It is only in cases where it is conclusively evident that this cannot nor will not be done that the injunction should issue. "An ounce of prevention is worth a pound of cure," says the old adage, and we think it is very applicable to situations like this.

We consider then whether the complaint shows affirmatively that the law had not been and could not be complied with. The constitutional provisions first above quoted granted to the people the right to submit measures by initiative petition, but they carefully limit and explain the manner in which those petitions must be prepared and how the questions must be submitted to the voters. Since by article 2, section 32, all provisions of the Constitution are mandatory and since by subdivision 15, section 1, article 4, the section is self-executing, if the provisions of the section are not substantially complied with, an act approved by the people in a *manner* contrary to that provided by the Constitution is just as invalid as an act passed by the legislature in a *manner* prohibited by constitutional mandates. Let us determine then how an initiative measure must be submitted. Subdivision 9, section 1, part 1, of article 4, *supra,* pro-

vides very carefully for the form of the petitions. It is not contended that in the present case the petitions filed with the Secretary of State did not comply with the above subdivision. Subdivision 10 then makes it the duty of the Secretary of State when any measure has been filed "in accordance with this section" to cause the title and number of the measure to be placed on the ballot for submission to the people at the next general election, for their approval or disapproval. Were this all, it would be plain that since the petition did comply with subdivision 10, it would be the duty of the defendant to cause the measure to be submitted and the injunction should be denied. But subdivision 10 is only a part of the section. Subdivision 11, *supra,* which provides for the manner of giving notice to the people of their submission, is equally a part thereof. It is of course true that all the provisions of the Constitution, as well as those of the statutes, must be construed together and effect given to all of them if possible. Since they are all mandatory, it is equally necessary in order that the proposed law be validly submitted to the electorate that the petitions be in correct form, and that proper publicity be given thereto. The publicity is just as important as requiring the petition to be signed by a certain number of electors, and indeed, perhaps, more so. After all, no serious harm could be done the public if the number of electors who were required to sign an initiative petition were great or small, or, indeed, except for the excessive cost to the state, if a law could be submitted at the request of a single elector. But when the people are given the right and the duty of legislating directly, it is imperative, in order to secure wise legislation, that they be fully informed as to the nature and details of the measure upon which they are called to pass. We think, therefore, that the constitutional provision in regard to publicity must be substantially followed or

the proposed law cannot be legally adopted. Let us then consider what kind of publicity must be given. Subdivision 11, *supra,* provides that the text of all measures submitted must be published in the same manner as amendments to the Constitution are published, and this manner is set forth in article 21, *supra.* It appears therefrom that "until a method of publicity is otherwise provided by law" the publicity required by the Constitution is the publication of the amendment, initiative or referendum, as the case may be, in a newspaper in each county of the state for a prescribed period. But the section expressly states that this method is to be followed only so long as some other method is not provided by law. The legislature, therefore, at its first session in 1912, provided a different method of publicity, which was carried forward into the Codes of 1913 and 1928 substantially as first written. Summarizing this method, it is as follows: The petition itself must be filed not less than four months previous to the election at which it is to be voted upon; in this case, on or before the 3d day of July, 1936. Under section 1746, *supra,* as it appeared up to 1935, the Secretary of State was required to cause a pamphlet to be printed which set forth the full text of the proposed initiative, with various other information in regard to it, including arguments *pro* and *con* on the question. He was then required, within a specified time, to mail a copy of the pamphlet to every voter in the state whose address he might have, until all registered voters were supplied. This method of publicity was followed from the beginning of statehood up to and including the general election in 1934. The vital points of the publicity, it will be seen, were (a) the full text of the measure; (b) the permissive argument *pro* and *con*; and (c) the distribution of the pamphlet containing these things *by mail* to each registered

voter of the state, within a specified time. In 1935, for reasons satisfactory to itself and which we need not consider, the legislature, acting in pursuance of the constitutional authority bestowed upon it, came to the conclusion that the method provided by section 1746, *supra,* was unsatisfactory, and, with full knowledge of the manner in which it had been handled in the past, deliberately decided that such method of publicity should no longer be followed, but that instead thereof, the pamphlets should be *distributed by the election boards directly to the voters who participated in the general primary election, and not mailed to the registered voters by the Secretary of State.*

Defendant Kerby, in his answer, admits that he did not have printed and distributed the publicity pamphlets above referred to in accordance with the provisions of chapter 62, *supra,* but he justifies his action on the ground that the chapter is unconstitutional and void. If his contention be true, the original section 1746, *supra,* would of course be in effect, and it was his duty to cause the publicity pamphlets to be printed and distributed substantially in accordance with the provisions of that section. If, on the other hand, chapter 62 was and is constitutional, it was his duty to proceed according to its terms, the original section 1746 of course being repealed by the later enactment and of no more effect, so far as a valid method of giving publicity was concerned, than the provisions of article 21 of the Constitution in regard to publicity by publication in the newspapers.

 Let us consider then the constitutional question. Defendant Kerby's objection is based on the claim that the provisions of chapter 62, *supra,* cannot be carried out within the time permitted by the chapter. Can this contention be upheld? Subdivision 4, section 1, part 1, article 4 of the Constitution requires that initiative petitions be filed not less than four

months preceding the date of election at which the measures are to be voted on. It was necessary, therefore, that the initiative petition involved herein should be filed not later than July 3, 1936. Defendant could not, however, have the pamphlets printed immediately, as, under the provisions of chapter 62, *supra,* it was permissible that arguments *pro* and *con* on the various propositions be filed, and the time for filing arguments did not close until July 24th. The actual printing of the pamphlets, therefore, could not have started under any circumstances before July 24th. But it was unquestionably the duty of the defendant, knowing that after July 24th the statute gave only up to August 29th to have the pamphlets printed and distributed to the various boards of supervisors, to make every preparation within his power so that the actual printing could start as soon as possible after July 24th. There is no requirement of law that the Secretary of State shall adopt any particular method in having the publicity pamphlets printed. He is not even required to advertise for bids for their printing, although he is not prohibited from so doing, and, indeed, the custom under proper circumstances is highly commendable. But he should never follow this method if it is likely to interfere with the far more important duty of printing and distributing the pamphlets as required by law. He knew long before July 3d as well as he could know after that date everything needed in order to advise the various printers of the state exactly what would be necessary for them to do in order to prepare for the printing of the pamphlets and to submit bids therefor, except the exact number of pages which the pamphlets would embrace, these depending of course upon the length of the proposed initiative and the extent of the arguments. But since these pamphlets have always been printed at a fixed price per page and not per pamphlet, there is no reason which we

can see why he could not have had all his arrangements made, including his contract for printing at whatever price per page should be agreed upon, long before July 24th, or even before July 3d. It would seem, therefore, that a conscientious officer, zealous to comply with the law, would have made all these arrangements in ample time so that all that would have been necessary after the 24th of July would have been to deliver a copy of the proposed initiatives and referendums, and the arguments thereon, to his chosen printer, so that the actual printing could be done immediately. Was it then impossible to set up, proofread, print, and distribute the pamphlets between the 24th of July and the 29th of August? The answer of defendant Kerby shows, as a matter of fact, that he did have 150,000 of such pamphlets printed and delivered to him between the 17th day of August and the 24th day of September, a period of 38 days. We know that every county seat in the state may be reached from Phoenix by truck in 24 hours. Between the 24th of July and the 29th of August is 35 days. We think it is obvious that the 35 days would have been more than ample time for him to have had pamphlets printed and distributed under the provisions of chapter 62, *supra,* for judging from the terms of the answer, part of the 38 days must have been used by his selected company in ordering and securing the proper stock of paper for the job, a thing which could and should have been arranged for long before July 3d. He does, it is true, set up that he made an attempt to comply with chapter 62 but could not do so because he could not get any printer to do the work in the time required. An examination of the various steps which he alleges he took to comply with the law convinces us that any competent Secretary of State who desired, above all things, to comply with the law could easily have done so with the proper

effort. We hold, therefore, that chapter 62, *supra,* was constitutional in all respects, within the power of the legislature to enact, and within the power of the executive officers of the state to carry out.

■ The last question for our consideration is whether, notwithstanding chapter 62 is constitutional and was not complied with, and that at the time this action was brought it was impossible to comply with it by distributing the publicity pamphlets at the primary, since it had already been held, it was still possible to give the publicity, which we have stated was mandatorily required by the Constitution and without which no valid law could have been approved by the electors, in a manner which would satisfy the requirements of the Constitution and the statutes. It is claimed that had defendant Kerby not been enjoined and had the auditor approved of his claims for the labor and stamps necessary, he could and would have mailed to the voters of the state, not indeed in the time provided· by original section 1746, *supra* (for that time also had then passed), but at least so that the voters would have received them a reasonable time before November 3d, the publicity pamphlets involved. It is not contended that such conduct would have been a literal compliance with chapter 62, but it is urged most strenuously that it would have been a substantial compliance therewith. The general rule, and that which we have adopted in Arizona, is that statutory directions as to the time and manner of giving notice of an election are mandatory and will be upheld strictly in a direct action, such as this, instituted *before* an election, but that in an action brought *after* the election has been held substantial compliance therewith is all that need be shown. *Mc-Loughlin* v. *Prescott,* 39 Ariz. 286, 6 Pac. (2d) 50. But even assuming that substantial compliance is all that it is necessary to show in an action *prior* to the

election, does it appear that the provisions of chapter 62 (the only law which set forth what notice should be given) could have been substantially complied with after this suit was filed?

There were but two manners in which defendant Kerby could have gotten the publicity pamphlets into the hands of the voters. He might perhaps have delivered them to the various election boards, so that they could be distributed to the voters at the general election, instead of the primary, just before they cast their ballots. But to say that this gave adequate publicity to a matter so important as general legislation is an utter absurdity. The voter would have appeared at the polls ready, willing, and anxious to then and there cast his ballot. If he had made the slightest attempt to read, let alone to consider the proposed initiative, he would have been compelled to retire from the polls and spend an indefinite time in examining the pamphlet. The particular measure under consideration shows on its face that several hours, if not days, would not be too much time for the average voter to spend in studying its provisions in order that he might reasonably acquaint himself with their effect if they were adopted as law. We think it is plain neither the letter nor the spirit of the constitutional provision would have been complied with by such procedure.

The second method, and that which defendant states he expected to follow, was to mail the pamphlets to the various electors. This, of course, could not have been done within the fifty-five days prescribed by section 1746, *supra,* but it is contended that it could have been done in sufficient time so that the voters would have received their pamphlets long enough ahead of the election to give a reasonable amount of study thereto. This is perhaps true, and were the only defect in his proposed method that it did not

comply exactly with the time limit set in the statute, we might hold it to be sufficient, for there is one, though so far as we are aware only one, case holding that a failure to distribute publicity pamphlets in the precise time required by law, is not fatal, so long as they are actually distributed to all the voters entitled to receive them long enough before the election that they will have the opportunity of studying them. *Hildreth* v. *Taylor,* 117 Ark. 465, 175 S. W. 40. But even in the jurisdiction from which this decision comes, it is pointed out that the rule only applies when the question is raised *after* the election. *Hogins* v. *Bullock,* 92 Ark. 67, 121 S. W. 1064, 19 Ann. Cas. 822. But this is not the only, nor, indeed, the most, important variation from chapter 62. The method of distribution prescribed by the chapter is *personal delivery to the voter at the primary.* The method which the defendant desired to use was *distribution through the United States mail.* That these two methods are as different as it is possible to conceive is obvious at the first glance. In fact, the only argument which can be made in support of the contention that it would have been a substantial compliance with the law is that so long as the voters got the pamphlets, it made no difference *how* they were delivered.

Had the method of distribution by mail never been tried, it might perhaps have been urged, with some plausibility, that the legislature would have been just as well satisfied with that method of getting the pamphlets to the voters as any other. The fact is, however, that the legislature, after many years' experience with the distribution by mail, definitely and explicitly repudiated that method and formally adopted another and absolutely different one. We need not determine just why they changed the time and method of delivery of the pamphlets. It may have been the lesser expense to the state; it may have been

the earlier date of delivery; it may have been a belief that a pamphlet personally delivered would make more impression on the voter than one received by mail, or it may have been a combination of all these with, perhaps, other reasons. The ultimate result is the same. The legislature, after long experience and due deliberation, decided that delivery by mail was not *proper publicity* and substituted another and entirely different manner of securing such publicity.

The argument that the old method was adequate, or, indeed, the best publicity might well have been addressed to the discretion of the legislature when chapter 62 was under consideration, but to argue to a court that following the method whose repeal was the obvious purpose of the legislature in adopting the chapter was a substantial compliance with the new law seems rather illogical, to say the least. It might as well be said that if the warden of the state prison finds the lethal gas chamber defective when the date of an execution arrives, he may legally use the repudiated method of hanging, because, forsooth, the ultimate object of the death of the prisoner will have been achieved thereby. It may be suggested the illustration is not apt, because in that case a life is involved, a matter of more importance than the publicity given a law. It seems a strange argument that the importance of the issue involved has a bearing on the *meaning* of a statute which affects it, although it may on its *necessity*. To say, under these circumstances, that a public officer by adopting a method that had been tried and found wanting by the legislature was substantially complying with the law which expressly provided an entirely different method is hardly worthy of serious consideration.

We are constrained to hold that neither of the only manners in which the publicity pamphlet could have been actually distributed to the voter when this action

was filed was, in the slightest degree, a substantial compliance with the method which the legislature, after careful consideration and deliberation, had adopted as the only one which could be used. Further, it is pure speculation as to whether the publicity the secretary claims was possible after he was served with the injunction would have been given had he not been enjoined. Since such publicity is not the publicity provided by chapter 62, there has not been any appropriation by the legislature to pay for it. Defendant asserts, in effect, that even that method cannot be followed unless the auditor will approve his claims for wages and other expenses of mailing pamphlets. The auditor is permitted to audit and allow claims against the state for which the legislature has appropriated money, and not otherwise. The only manner then of distributing the pamphlets by defendant would have been at his own expense, and this he does not, in his answer, offer to do.

Reducing the whole matter to its simplest terms, the Constitution has made the legislature the sole judge of how the publicity absolutely required, in order that the initiative and referendum provisions of that instrument may be workable and not a trap for the voters, shall be given. If we sustain the answer of the defendant, we are transferring that power to the Secretary of State by what is, in effect, judicial legislation in defiance of the constitutional mandate and the expressed will of the legislature, for if he may substitute one method repudiated by the legislature for that prescribed by that body, he may with equal right use any other one which suggests itself to him as being sufficient. The trial court did only its duty when it refused to permit an expensive and futile thing.

Judgment affirmed.

ROSS, J., concurs.

McALISTER, J., Dissenting.—I regret that it is not possible for me to concur in the conclusion reached by my colleagues and will state briefly the reasons why.

The complaint filed by the plaintiffs shows upon its face that the initiative petition filed with the Secretary of State proposing to amend certain sections of the Revised Code of 1928 and asking that it be submitted to the qualified electors of the state for their approval or disapproval at the next regular general election was regular in form, signed by the required number of qualified electors and filed within the proper time, and when the proponents of a measure have complied with the Constitution in these respects they have done all the law requires of them to have that measure submitted to a vote of the people. It then becomes the duty of the Secretary of State under subdivision 10, section 1, article 4 of the Constitution, to cause to be printed on the official ballot the title and number of the measure in such a way that the voters may express at the polls their approval or disapproval of it. His duty under these circumstances to do this is mandatory and, as I see it, the court has no power to interfere with his performance of it, because placing the measure on the ballot is made by the Constitution itself a step in the process of legislating by the people and after the machinery therefor has been set in motion by the filing with the Secretary of State of a legally sufficient petition proposing a measure the court's power to enjoin him from placing it on the ballot is no greater than it is to enjoin the legislature from taking such action as it desires upon any bill making its journey through that body. To hold that it is appears to be an interference with the independence of the legislative branch of the government.

As stated in *Cress* v. *Estes et al.*, 43 Okl. 213, 142 Pac. 411, 412:

"The power to propose and adopt a proposition of any nature and to amend their Constitution is vested in the people, and in the exercise of such power they constitute the legislative branch of the state government, and are not subject to interference or control by the judiciary."

*In re Initiative Petitions*, 153 Okl. 205, 6 Pac. (2d) 703, the court used this language:

"When the copy of the petitions was filed in the office of the Secretary of State, and thereafter signed by what seemed to be a sufficient number of the voters of the state to initiate the measure, it placed in motion the process of the people's exercising their reserved legislative power, and a court of equity, as a general rule, will not assume, in advance, jurisdiction to determine whether the proposed act, if adopted, is submitted and adopted in accordance with the law governing the same."

See, also, *State* v. *Osborn*, 16 Ariz. 247, 143 Pac. 117; *McAlister* v. *State*, 96 Okl. 143, 221 Pac. 779; *McAlister* v. *State*, 95 Okl. 200, 219 Pac. 134, and long list of cases in annotations in 33 A. L. R. 1370.

The fact that the Secretary of State may not have observed some other provision of the Constitution or the law, for instance, that requiring the giving of publicity regarding a measure to be submitted, does not, it would seem clear, have the effect of supplying, creating or bringing into being something that did not exist before, namely, power in the court to prevent the Secretary of State from performing a duty made mandatory by the Constitution itself. Even though failure to give the required publicity might render the measure invalid, as it likely would since the initiative and referendum are based on the idea that the people will be fully advised concerning any measure they are asked to vote on, yet this question could properly arise

only if the measure should be approved and its validity attacked.

The situation is entirely different from that which presents itself where the legal sufficiency of a petition proposing a measure is questioned. In the very nature of things the court has the power to determine this, if questioned, before the Secretary of State places a measure on the ballot, because the very foundation of an initiative or referendum proposal is that the petitions calling for its submission to the voters "shall conform with the requirements of the law as to form and signature. It is not a legal petition if not regular in form, and does not contain the signatures of legal voters as required. . . . If it is fraudulent or if the signatures are forged, it is not legally sufficient." *State* v. *Osborn*, 16 Ariz. 247, 143 Pac. 117, 118. And in *Barth* v. *White*, 40 Ariz. 548, 14 Pac. (2d) 743, 746, the court, after stating that the complaint showed affirmatively that the petition was sufficient in form and bore the number of signatures required by the Constitution, said: *"Nothing further is required to make it the duty of defendant [secretary of state] to place the proposed amendment on the ballot."* (Italics ours.)

However, my principal reason for expressing dissent from the majority opinion is that regardless of the correctness of the position that the Secretary of State's failure to publicize the measure as required by law gave the court jurisdiction to enjoin him from placing it on the ballot, that power should not, in my opinion, have been exercised under the facts confronting the court in this case. The proponents of the measure had done everything within their power to procure a vote on it when they filed with the Secretary of State in proper time and form and signed by the required number of qualified electors a petition proposing it, and when it is kept in mind that it took

much time, labor and expense on their part to secure the more than eleven thousand signatures necessary to constitute a valid petition, their right to have the voters express themselves on the measure at the polls, should not be denied, unless there was at the time the injunction was issued no possible way by which the Secretary of State could comply, at least substantially, with the law requiring him to distribute to the voters the publicity pamphlets. Could this have been done?

Under the law as it existed up to 1935, section 1746, Revised Code of 1928, it was the duty of the Secretary of State to have the publicity pamphlets printed and distributed by mail, one to each voter in the state, fifty-five days prior to the general election, though only twenty days are required in case of a special election, but the Twelfth Legislature, by the enactment of what it commonly referred to as the Angius Law, chapter 62, Session Laws 1935, changed the method of distributing them by requiring the Secretary of State to send a number of them equal to the registered voters in any county to the board of supervisors thereof to be by that body sent to each voting precinct in the county along with the election supplies to be delivered there. It was then made the duty of the election board to distribute one copy to each elector as he voted at the primary election, the unused pamphlets to be turned over to the county recorder upon whom was imposed the duty of delivering one to each voter registering thereafter before the general election. That those who fail to vote at the primary do not receive one does not perhaps invalidate the law since they are charged with notice of the fact that it provides that those who vote at that time will be furnished one.

The Secretary of State did not procure the printing of the pamphlets and distribute them to the boards

of supervisors within the thirty-five days from July 24th, or by August 29th, and as a reason for his failure to do so alleges that he advertised for bids and due to the fact that there was not sufficient time to print and deliver them received none, and that in consequence of this the thirty-five days did not give him sufficient time in which to comply with this provision, and, hence, that the act was unworkable and, therefore, invalid. The majority opinion holds, however, that it is valid and should have been followed in the distribution of the pamphlets, and in this portion of the opinion I concur, because the time given would appear to be ample to do all the law requires to be done. But if it was not, six or seven days additional time was available to the Secretary of State, since, notwithstanding the law fixed ten days prior to the primary election as the last day on which the pamphlets should be forwarded to the supervisors, they would have been in ample time if they had reached the boards not later than three or four days prior to that election, for that would have allowed all the time needed to have them sent out with the election supplies to the various precincts. To have delivered them to the boards ten days ahead of time, or on August 29th in 1936, could only have meant that they would have lain in the office of the board until its clerk was ready to send out the precinct election supplies, and if they reached the supervisors in time for this, there would have been a substantial compliance with the law, for it is clear that this provision of it is merely directory and not mandatory.

Regardless, however, of the secretary's failure to comply with the Angius Law, or the reasons that actuated him in not doing so, the question arises whether on October 2, 1936, the day he was permanently enjoined by the trial court from placing the measure on the ballot, he still had time to distribute the pamphlets

to the voters of the state in a way that could be treated as a substantial compliance with that law. My colleagues say that this could not have been done, that the Angius Law is mandatory in terms and, hence, in effect, that the observance of it was a necessary prerequisite to the validity of the measure, even if it had been submitted and approved by the people. I readily agree that the law should have been followed and that the Secretary of State, if the aid of the court had been sought in time through the extraordinary writ of *mandamus*, could have been compelled to obey its terms. But, notwithstanding this, I cannot agree that the act is so mandatory in character that its terms demand that the Secretary of State should have been permanently enjoined by a court of equity from further distributing the pamphlets through the mail, the thing he was doing when temporarily restrained on September 16th. My reason for this is that that act did no more than change the time and manner in which the Secretary of State was directed to distribute the pamphlets, the former being extended from fifty-five to sixty days and the latter changed from sending them to the voters through the mail to delivering them to the boards of supervisors to be by them sent to the election officers of each precinct in the county whose duty it became to distribute them to the voters as they cast their ballot at the primary election. The time, except in so far as it was connected with the manner of distribution, was clearly directory, because the pamphlets, if delivered to the voters sufficiently far ahead of the general election to enable them to study the measure thoroughly, and no one would say that twenty-five or thirty days was too short for this, fully met the purpose of the law and the constitutional provision that the voters be fully advised as to the various matters upon which they are asked to express themselves. In fact, according to the statute itself, 1746,

*supra,* twenty days before they vote on a measure is all that is required in case of a special election. The rule, in so far as it affects the time in which an act is to be done by a public officer, is stated thus in 59 C. J. 1078, par. 634:

"(4) Time for Performance of Duties. A statute specifying a time within which a public officer is to perform an official act regarding the rights and duties of others, and made with a view to the proper, orderly, and prompt conduct of business, is usually directory, unless the phraseology of the statute, or the nature of the act to be performed and the consequences of doing or failing to do it at such time, is such that the designation of time must be considered a limitation on the power of the officer."

See, also, *Missouri Pac. R. Co.* v. *McIntosh,* 92 Okl. 153, 218 Pac. 693; *State ex rel. First Nat. Bank of Klamath Falls* v. *Siemens,* 68 Or. 1, 133 Pac. 1173; *Board of Arapahoe County Commrs.* v. *Union Pac. R. Co.,* 63 Colo. 143, 165 Pac. 244, 246; *Hildreth* v. *Taylor,* 117 Ark. 465, 175 S. W. 40.

In stating the rule guiding public officers in certain instances as to the manner in which they should proceed in the performance of their duties, 59 C. J. 1077, par. 633, uses this language:

"Generally, statutes, directing the mode of proceeding by public officers, designed to promote method, system, uniformity, and dispatch in such proceeding, will be regarded as directory if a disregard thereof will not injure the rights of parties, and the statute does not declare what results shall follow noncompliance therewith, nor contain negative words importing a prohibition of any other mode of proceeding than that prescribed. Especially is this true where to hold void acts done in violation of the statute would work serious inconvenience, or would cause injustice to persons having no control over those intrusted with the duty enjoined, and at the same time would not promote the main object of the statute."

See, also, *Missouri Pac. R. Co.* v. *McIntosh, supra; Board of Arapahoe County Commrs.* v. *Union Pac. R. Co., supra.* In the last of these two cases appears this language:

"Statutes prescribing the manner, form, and time within which public officers are required to discharge the public functions are regarded as directory, unless there is something in the statute which shows a different intent."

The Secretary of State's disregard of the Angius Law did not injure the plaintiff's rights, provided the other method be held sufficient under the circumstances, neither does that law declare what result shall follow his failure to comply with it, nor does it contain negative language importing a prohibition of any other mode of distributing the pamphlets than that provided therein, and to hold void their distribution through the mail because it was in violation of this statute undoubtedly works a serious inconvenience, and causes an injustice to the proponents of the measure as well as to the other voters of the state, none of whom had any control over the acts of the Secretary of State, and at the same time does not promote the main object of the law. This being true, I am unable to see wherein the failure to observe the Angius Law in distributing the pamphlets is any reason why those interested in the initiative measure should have been thwarted in their efforts to submit it to a vote of the people as long as it was still possible to distribute them through the mail in ample time for the voters to study it thoroughly and in a manner just as effective as that set up in the Angius Law; in other words, as long as the way was still open to comply substantially with the main purpose of that act, that is, to distribute to the voters without expense to the state, the saving of which alone prompted its passage, the *identi-*

*cal pamphlets* that would have been handed them by the electors and to do so in ample time to enable them to gain the information they needed to vote intelligently on the measure. To hold that this could not be done is in its final analysis to say that the measure would have had no validity whatever if approved by the people merely because the publicity pamphlets from which the voters obtained their information concerning it were handed to them by a postmaster rather than by an election officer at the primary. This is too technical for me, for to my mind it is no more reasonable than to say that the approval of the measure could not stand, because the pamphlets were handed the voters by an election officer after they had cast their ballots, instead of before if the law had so directed, or by their left hand when they should have used their right. I feel sure that if the Secretary of State had not been enjoined from placing the measure on the ballot and the people had approved it, after the pamphlets had been distributed by mail three or four weeks before the primary, ample time to enable them to understand it, neither this court nor any other court in Christendom would have held the measure invalid, merely because the publicity pamphlets found their way to the voters through the postmasters of the state rather than through the officers of the nineteen thirty-six primary election. Under such circumstances it would undoubtedly have been held that the law had been substantially complied with and as long as this result was possible the court should not have enjoined action that might have brought it about. If the Secretary of State had been permitted to place the title and number of the measure on the ballot and then failed to send out the publicity pamphlets, the validity of the measure, if approved, would then have been open to attack.

The suggestion in the majority opinion that there was no way by which the expense of sending the pamphlets by mail could have been cared for, since the time for compliance with the Angius Law which provided the only method of spending public funds to distribute them had long since gone by, is, in view of the fact that the Secretary of State could and might have done it himself, wholly immaterial in an action to enjoin that officer from placing the matter on the ballot, but would be important if the action were one in *mandamus* to compel him to place it there and this carried with it the duty to distribute the pamphlets at his own expense, since he could not be compelled to perform such an act unless the funds with which to take care of it had been provided. But the Secretary of State may have realized that he had made a mistake in failing to obey the Angius Law and desired to rectify it by mailing the pamphlets at his own expense, either with or without the hope that the legislature might feel that he had honestly tried to comply with that law but due to the lack of time it allowed him had been unable to do so, and would reimburse him, and as long as this possibility existed he should not have been enjoined from placing the title and number of the measure on the ballot.

It is my judgment that the order of the trial court enjoining the Secretary of State from doing this was erroneous and should be reversed.