713 P.2d 813

Ronald Gene MOORE, a qualified
elector of the City of Page,
Arizona, Plaintiff-Appellant,

v.

The CITY OF PAGE, Arizona; David A.
Pape, Mayor, George Koury, Pam Ever-
hart, Harold Johnson, Jo Ellen Bing-
ham, Don Thibodeaux and Scott Or-
rock, Councilmen; and Pat McCourt,
Clerk, Defendants-Appellees.

No. 1 CA–CIV 8316.

Court of Appeals of Arizona,
Division 1, Department C.

Jan. 16, 1986.

153

Magnum, Wall, Stoops & Warden by Stephen K. Smith, Flagstaff, for plaintiff-appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by John H. Westover, Richard E. Mitchell, Scott E. Boehm, Alan A. Meda, Phoenix, for defendants-appellees.

KLEINSCHMIDT, Judge.

Ronald Gene Moore, an elector of the City of Page, challenges the judgment entered against him in an action he filed to invalidate the results of a bond election held in Page on January 29, 1985. Although certain irregularities with respect to the election occurred, we affirm the court below and validate the election because we are convinced that there was no fraud or chicanery practiced against the voters of Page, and we feel certain that the result of the election was unaffected by the irregularities.

## FACTS

Arizona Public Service Co. supplies electricity used by the residents of the City of Page. Since 1976, the year after the city was incorporated, the city has considered acquiring the electrical distribution facility which services the city. In late 1983 or early 1984, a petition bearing the signatures of 400 citizens of Page was submitted requesting the city council to look into the acquisition. Following submission of the petition, the city council set up a citizens' committee and hired an attorney and a consulting firm from Washington, D.C. to advise the committee. The committee conducted a feasibility study and in December 1984, recommended to the city council that the city acquire the electrical distribution system owned by Arizona Public Service.

On December 19, 1984, the Page City Council adopted Resolution No. 294, which called for a special bond election to be held on January 29, 1985. The council wanted to have the election as soon as possible so that the city would be eligible to acquire supplemental power from Hoover Dam, an acquisition that was believed would save the rate payers a large sum of money. The specific question to be voted on was:

Shall the City of Page, Arizona be authorized to incur indebtedness by the issuance of electric utility revenue bonds in the principal amount of $10,000,000.00 dollars for the purpose of providing funds to acquire the existing electric distribution system providing the City's inhabitants and others with electric power and light, including all right-in-land, properties, facilities and equipment necessary for the operation of said system and to pay all legal, financial, engineering consulting and other necessary costs in connection therewith, said bonds to be in denomination of $5,000.00 each, or any multiple thereof, to bear interest at a rate not to exceed 13% per annum payable semi-annually on the first day in July and January of each year (except that the first payment may be in a period not to exceed one year) until the maturity of each bond and the bond to mature over a period not to exceed thirty (30)

years from the date of issuance and to be payable solely from the revenues of the electric distribution system?

The resolution to hold the election passed without the three-fourths vote of the city council necessary for it to take immediate effect as an emergency measure. Therefore, under the terms of A.R.S. § 19–142(B) and Page City Code, § 2–5–6 the resolution did not become effective until thirty days after it was passed.

On January 9 and on January 16, 1985, notice of the election was published in the *Lake Powell Chronicle.* The notice was a copy of Resolution 294, except the words "and declaring an emergency" were erroneously left in the title, which was printed in bold-face.

Pursuant to A.R.S. § 16–172, the city contracted with the Coconino County Recorder to provide the city with a register of eligible voters for the January 29, 1985, election. The contract was executed on December 28, 1984, only thirty-one days before the election was to be held. It provided that the register would list the names of only those who were registered to vote on December 10, 1984, the fiftieth day before the scheduled election. The reason for this was that A.R.S. § 16–123 requires that registration be cut off fifty days before a special election.

During negotiations for the contract, the county recorder told the mayor and city clerk that A.R.S. § 16–172 required such contracts to be executed at least sixty days before the election. She also pointed out the unfairness of calling an election after the registration cut-off for the election had passed. She testified that despite her misgivings it was her understanding that she had no discretion to refuse to contract with the city. She also testified that when the sixty-day requirement of A.R.S. § 16–172 is complied with, she uses the time between execution of the contract and the registration deadline to notify the news media in the area to be effected by the election that there will be a registration deadline. She does this to give potential voters a chance to register in time to vote.

On January 1, 1985, the Coconino County Recorder, as required by A.R.S. § 16–166, purged from the general county register of Coconino County the names of all persons listed thereon who did not vote in the 1984 general election and who did not have a valid driver's license in Coconino County. The County Recorder did not inform the city that 254 of the names she had previously provided to the city as persons registered to vote in the January 29, 1985, election should have been purged from the list. Consequently, 254 persons who were ineligible to vote remained on the list of registered voters who could vote in the special election. At trial, there was no evidence as to how many, if any, of these ineligible persons actually voted.

The results of the January 29, 1985, election were 1,570 in favor of the bonds and 149 against. The results were canvassed and ratified on February 5. On February 8, Moore filed an action to contest the results of the election. After trial, judgment was entered against Moore and the election was confirmed. Moore filed a timely appeal.

Moore raises five issues:

1) Whether the election is invalid because the city used registration lists which contained names of unqualified electors;

2) Whether calling the election after the registration deadline resulted in a disenfranchisement of voters which invalidates the election;

3) Whether the trial court correctly upheld the results of the special bond election where on both the notices and ballot the city represented that the bonds could be issued at up to 13% interest;

4) Whether the city misrepresented the election as an emergency measure and undertook action pursuant to the authority of the resolution prior to the effective date of the resolution; and

5) Whether the trial court applied the proper standard of proof in this case.

## GROUNDS FOR ELECTION CONTEST

For their part, the appellees contend that Moore is not legally entitled to bring this action because he supposedly failed to assert any grounds for relief under A.R.S. § 16–672, which governs election contests. We address this threshold question first and we, as did the trial court, reject the appellees' contention.

Arizona Revised Statutes § 16–672 provides that an election contest must be based upon the following grounds:

1. For misconduct on the part of election boards or any members thereof in any of the counties of the state, or on the part of any officer making or participating in a canvass for a state election.

2. That the person whose right to the office is contested was not at the time of the election eligible to the office.

3. That the person whose right is contested, or any person acting for him, has given to an elector, inspector, judge or clerk of election, a bribe or reward, or has offered such bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise.

4. On account of illegal votes.

5. That by reason of erroneous count of votes the person declared elected or the initiative or the referred measure, or proposal to amend the constitution, or other question or proposal submitted, which has been declared carried, did not in fact receive the highest number of votes for the office or a sufficient number of votes to carry the measure, amendment, question or proposal.

The gist of the appellant's claims fits within one of the two following grounds: "the person whose right is contested, ... has committed any other offense against the elective franchise," or "on account of illegal votes."

■ Earlier decisions have considered the following as grounds for an election contest: that unregistered voters have voted, *Territory ex rel. Sherman v. Board of Supervisors of Mohave County,* 2 Ariz. 248, 12 P. 730 (1887); that the election was held in a building other than that designated in the election notice, *Chenoweth v. Earhart,* 14 Ariz. 278, 127 P. 748 (1912); that ineligible electors were allowed to vote and that the ballot was not in the form required, *Abbey v. Green,* 28 Ariz. 53, 235 P. 150 (1925). Certainly, the failure, on January 1, 1985, to purge from the registration lists those who had not voted in the preceding general election would support a contest "on account of illegal votes." We think this, as well as the call for an election after registration had closed and the inclusion of misleading or irrelevant material on the ballot and in the notices of the election, constitute a sufficient allegation of offenses against the elective franchise to come within the statute.

■ We further find, contrary to the city's contention, that Moore is not estopped from raising these issues after the election. Our supreme court ruled in *Griffin v. Buzard,* 86 Ariz. 166, 342 P.2d 201 (1959), that estoppel is not a defense to an election contest. In *Griffin,* the contestor challenged the results of a primary election, asserting that the winner of the election had confused the voters by placing the name of a sham candidate on the ballot. The defense asserted that the contestor was estopped from challenging the election because he knew of the fraud two months before the election. The court held that if estoppel were a defense in an election contest, the statutory provision allowing a contest after an election would be nugatory. *Griffin,* 86 Ariz. at 173, 342 P.2d at 205.

None of the four cases appellees cite applied the estoppel doctrine in an election contest suit. Two of them, *Renck v. Superior Court of Maricopa County,* 66 Ariz. 320, 187 P.2d 656 (1947) and *Allen v. State,* 14 Ariz. 458, 130 P. 1114 (1913), were not election contests but were cases challenging the validity of particular laws by collaterally attacking the procedures by which the laws came to be voted on by the people. Nor is *Kerby v. Griffin,* 48 Ariz. 434, 62 P.2d 1131 (1936), an election contest. It cites the estoppel doctrine in dicta for the proposition that it is proper to challenge

the means by which a measure is placed on the ballot *before* an election. *Kerby*, 48 Ariz. at 444, 62 P.2d at 1135. Finally, *McLoughlin v. City of Prescott*, 39 Ariz. 286, 6 P.2d 50 (1931), apparently an election contest, does not hold that prior knowledge of irregularities estops the contestor from raising them in an election contest; it merely states that if a person waits until after an election to file a challenge, the election will not be invalidated unless the contestor shows that the result was affected by the irregularities. Appellees have thus failed to cite any case in which an election contest was barred by estoppel, and we refuse to apply it here.

## FAILURE TO PURGE VOTER REGISTRATION LIST

A political subdivision of the state may contract with the county recorder under A.R.S. § 16–172 to prepare voter lists for local elections based on the county registration rolls. The city did contract with the county recorder to prepare a voter list for the bond election. The county recorder prepared the list based on the county registration rolls as they existed on December 10, 1984. That list contained the names of 254 ineligible electors who were purged from the county list on January 1, 1985. Moore claims that the results of the election should be set aside because ineligible persons voted.

The city relies on the testimony of the county recorder that she had followed her normal procedure, a procedure she believes is followed state-wide, when she prepared the list based on the county rolls as they existed on December 10, 1984. This procedure was accepted as correct by the trial court.

The procedure used by the Coconino County Recorder is contrary to our statutes governing voter eligibility in special elections. Arizona Revised Statutes § 16–123 states:

A person whose name appears on the general register of voters for the last preceding general state and county election and who has not been canceled out

for failure to vote ... shall, if otherwise qualified, be entitled to vote at any such special election authorized by law.

Arizona Revised Statutes § 16–166(A) provides:

The county recorder shall, on January 1 of the year following each general election, remove and cancel from the general county register the registration of any elector who did not vote in the preceding general election.

Pursuant to A.R.S. § 16–166(A), the Coconino County Recorder removed 254 Page electors from the county rolls on January 1, 1985. Arizona Revised Statutes § 16–123 clearly states that these 254 citizens became ineligible to vote in the special election at that time. Nothing in the law would allow these citizens to maintain their eligibility simply because the county recorder had previously prepared a register of voters for a special election.

Moore has failed to establish, however, that any of these ineligible citizens actually voted in the election. One who contests an election has the burden of proving that if illegal votes were cast the illegal votes were sufficient to change the outcome of the election. In *Morgan v. Board of Supervisors*, 67 Ariz. 133, 143, 192 P.2d 236, 243 (1948), our supreme court quoted with approval the general rule as expressed in 29 C.J.S. *Elections* § 274:

Where an election is contested on the grounds of illegal voting, the contestant has the burden of showing that sufficient illegal votes were cast to change the result, and of showing for whom or for what they were cast.

We cited the same principle in *Millet v. Board of Supervisors of Maricopa County*, 6 Ariz.App. 16, 19, 429 P.2d 508, 511 (1967), and went on to say that "[o]ur Court, by the pronouncements in *Morgan*, is committed to the general rule of law that where an election is contested on the grounds of illegal voting, contestant has the burden of showing that sufficient illegal votes were cast to change the result, and of showing for whom or for what they

were cast." *Id.* Moore cites no case which holds that an election is void if illegal votes may have been cast. A substantial number of authorities adhere to the principle announced in *Morgan. See Dowling v. Orleans Parish Democratic Committee,* 235 La. 62, 82, 102 So.2d 755, 762 (1958); *Northridge Park County Water Dist. v. McDonell,* 159 Cal.App.2d 556, 561–62, 324 P.2d 102, 106 (1958), *quoting* 29 C.J.S. *Elections* § 219; *Bush v. Johnson,* 111 Ga. App. 702, 706, 143 S.E.2d 21, 24 (1965); *Webb v. Benton Consolidated High School District No. 103,* 130 Ill.App.2d 824, 264 N.E.2d 415 (1970); *McJimsey v. Yates,* 324 S.W.2d 438, 441 (Tex.Civ.App.1959); 26 Am.Jur.2d *Elections* § 292 at 116.

■ As previously noted, Moore has not established that any of the ineligible electors cast a ballot in the special election. Further, considering the overwhelming number of votes by which the bonds were approved, the outcome of the election could not have differed even if every illegal vote had actually been cast in favor of the bond issue. The inclusion of the ineligible names on the voters list is not grounds alone to set aside the election.

## VOTER DISENFRANCHISEMENT

■ Moore also alleges that the election should be invalidated because Page disenfranchised an undetermined number of city voters by holding the election only forty-one days after it was called, thereby preventing unregistered voters from registering before the fifty-day cutoff provided for by A.R.S. § 16–123. Since the applicable statutes do not require the city to allow a registration period for a special election, and since Moore has not demonstrated that city officials engaged in chicanery or fraud and has not demonstrated that had additional voters been allowed to register the

result might have been different, his argument fails.

When a municipal corporation wishes to call a special election for the purpose of issuing bonds, it has a choice of procedures. One option, provided for in A.R.S. § 9–824, allows the municipal corporation to hold a special registration for the election beginning at least thirty days before and closing ten days prior to the date of election, thus guaranteeing a twenty-day registration period.

■ Another option is A.R.S. § 9–525, which applies if a municipal corporation issues bonds pursuant to Article 3 of Title 9, Arizona Revised Statutes.[1] This section gives the municipality the power to hold a special registration which must open no later than ten and close no sooner than five days before an election. This section is clearly optional; it does not mandate that the city actually hold such a registration drive. Whether A.R.S. § 9–525 applies to bonds issued under Article 2 of Title 9 is problematic; the only section which speaks of bond elections in Article 2 is A.R.S. § 9–514, which mandates that a city cannot avail itself of Article 2 powers unless authorized by an affirmative vote of the majority of electors at a duly called election. In any event, neither Article 2 nor Article 3 requires the city to hold a special registration.

Another option is for the city to use county registration rolls as provided for in A.R.S. § 16–172, which reads in part:

Any political subdivision of this state conducting an election pursuant to the laws of this state, which lies within a county, may use the county registration rolls to conduct such an election. The governing body of such a political subdivision shall negotiate a contract with the county recorder to reimburse the county recorder for his actual expenses in pre-

---

1. The statutes which authorize and enable municipalities to acquire, operate, maintain and improve utilities are found in two separate articles, designated Article 2 and Article 3 of Title 9, Arizona Revised Statutes. For reasons explained later, Article 2 deals with the original acquisition of utilities and Article 3 deals with

the improvement, extension and maintenance of them. Because the particular article in which a particular statute is found may be significant as to how the statutory provision is interpreted, we will frequently refer to the statute by its section number and by the article in which it appears.

paring the necessary lists.... Such contracts shall be negotiated at least sixty days in advance of the election.

If a city chooses to use this option, the qualifications of electors are as found in A.R.S. § 16–123, which applies to all special elections:

A person whose name appears on the general register of voters for the last preceding general state and county election and who has not been canceled out for failure to vote, or a person who voted in the last preceding general election for presidential electors only and has subsequently met the residency requirements for voting in all elections, or a person who has registered on or before the fiftieth day preceding a special primary, special general, special recall or other special elections, shall, if otherwise qualified, be entitled to vote at any such special election authorized by law.

■ Moore argues that A.R.S. § 16–172 and A.R.S. § 16–123 should be read together. He says that the purpose of the sixty-day requirement of A.R.S. § 16–172 is to provide voters at least ten days to register for special elections between the time a contract is negotiated with the county recorder and the fifty-day cutoff of A.R.S. § 16–123. This argument is unconvincing. Had the legislature intended to guarantee a registration period for bond elections, it would have said so directly by making A.R.S. § 9–525, which gives a city the option to hold a special registration, mandatory and applicable to elections under Article 2 and Article 3. It would not have relied on an obscure interpretation of A.R.S. § 16–172, a provision which has nothing to do with bond elections or registration but is found in that part of Title 16 which deals solely with the preparation and use of registration rolls. Arizona Revised Statutes § 16–172 applies to a broad range of elections, not just special bond elections. Its provisions apply to regularly called elections for city, town, and school district officers, as well as to bond elections, recall elections, or any election, regularly occurring or not, held by a political subdivision within a county. To argue that such a general statute was enacted for the narrow purpose of providing time for registration for a special municipal bond election is illogical, especially when the legislature could have easily done so more directly.

Finally, we note there is nothing in A.R.S. § 16–172 which requires the county recorder to conduct or publicize registration drives, nor is there any requirement that the fact or details of the contract between the county recorder and the municipality holding the election be made public. In short, A.R.S. § 16–172 neither looks nor operates like a statute intended to facilitate registration of electors. Its purpose is to allow political subdivisions to use the county registration rolls instead of requiring them to create rolls of their own. The purpose of the sixty-day deadline is to allow county recorders sufficient time to prepare the necessary list. Nothing in the statutes forbade the city from holding an election only forty-one days after it was called. The only time requirement in such a case is found in A.R.S. § 9–524, which states that the notice of election must be published between fifteen and thirty days before an election to issue bonds under Article 3, Title 9. Thus, the city did not impermissibly disenfranchise voters.

Moore argues that we should avoid finding that the statutory scheme for municipal bond elections does not guarantee registration opportunities for all elections. He says that "[r]egistration laws should be construed so as to uphold and sustain the citizen's right to vote." *Abbey v. Green,* 28 Ariz. 53, 72, 235 P. 150, 157 (1925). While this maxim may be true, we do not believe it allows us to superimpose a non-registration statute, A.R.S. § 16–172, onto the registration requirements of A.R.S. § 16–123, and thereby find, through tortured reasoning, that the legislature intended that no special election be held without at least a ten-day registration period. There is a gap in the labyrinth of various election and registration statutes found throughout the Arizona Revised Statutes which permits a municipal bond election to

be called after the time to register for the election has closed. This is not an ideal statutory scheme but correction must come through legislative action, not through our fashioning a remedy by fusing unrelated statutes.

Even if Moore were correct that A.R.S. § 16–172 mandates an opportunity to register before special elections or, in the alternative, assuming that Moore were correct that a statutory scheme which allows an election without an opportunity to register is unduly restrictive, he still would not be entitled to relief. Moore seeks to invalidate the results of an election. All but one of the cases he cites which condemn burdensome registration requirements were cases in which voters were attempting to vindicate their right to register or vote in an upcoming election. Although we express no opinion as to whether Moore could have successfully challenged Page's actions prior to election, we note that:

[t]here are two cardinal rules which, in the absence of specific statutory provisions to the contrary, always have governed election contests, not only in Arizona, but elsewhere. The first is that general statutes directing the mode of proceeding by election officers are deemed advisory, so that strict compliance with their provisions is not indispensable to the validity of the proceedings themselves, and that honest mistakes or mere omissions on the part of election officers, or irregularities in directory matters, even though gross, if not fraudulent, will not void an election, unless they affect the result or at least render it uncertain.

*Findley v. Sorenson*, 35 Ariz. 265, 269, 276 P. 843, 844 (1929). Since Moore challenged Page's procedure through an election contest, he is entitled to his requested relief only upon a showing of fraud or upon a showing that had proper procedures been used, the result would have been different.

■ Moore does not allege that Page city officials acted fraudulently, and we accept that the haste with which the election was held was due to the city's eagerness to qualify for supplemental power from Hoover Dam at an advantageous rate. Moore contends that if we permit cities to call bond elections without giving time for citizens to register, such will encourage proponents of a bond issue to insure that all in favor of it are registered, wait until the fifty-day deadline passes, and then disarm opponents by calling an election without providing an opportunity to register. Had such a stratagem been employed in this case, Moore would have a good case for fraud. Since it did not occur, Moore's argument is best addressed to the legislature.

Given that there was no fraud, Moore is obliged to show that the alleged disenfranchisement may have affected the result of the election. The vote was overwhelmingly in favor of the bonds. Information derived from precinct workers showed that at most, ten people who presented themselves at the polls were not allowed to vote. Only one person who was not allowed to vote testified that he would have voted against the bonds. Moore claims, however, that it was impossible for him to prove the full extent of the harm caused by the city calling the election after registration had closed. While the burden might be difficult to carry it would by no means be impossible. Page is a small community. Moore could have attempted to present at least a reasonable estimate, based on census data and reliable population projections of how many persons could have been eligible to vote, and compared that number with the number of those who were eligible to vote. If a great many potential voters were unregistered Moore could argue that the possibility the result would have been different was great, or at least enhanced. Moore presented no evidence of why it was impossible to quantify the harm.[2] The burden of proof in an election contest falls on the contestor; all reasonable presumptions must favor the validity of an election. *Millet v. Board of Supervisors of Maricopa*

2. After oral argument the city filed population data bearing on this issue. We question the propriety of this procedure and we do not, in any respect, rely on that information.

*County*, 6 Ariz.App. 16, 20, 429 P.2d 508, 512 (1967). Moore must do more than assert the impossibility of sustaining his burden of proof; he must demonstrate reasons for it.

The only case Moore cites in which an election was voided because of a retroactive registration cutoff is *Stephens v. Mayor of Albany*, 84 Ga. 630, 11 S.E. 150 (1890). In *Stephens*, the city council of Albany, Georgia, called a special bond election without allowing any registration beforehand. The city claimed that only those who had registered to vote for mayor and aldermen in a previous election were qualified to vote. The court ruled that the act specifying the qualifications for electors for mayor and aldermen were inapplicable to special bond elections because applying the qualifications would disenfranchise unwary citizens who were given no notice that failure to register to vote for mayor and aldermen meant disqualification from voting in any city election until the registration lists reopened almost one year later.

This case is distinguishable from *Stephens*. First, the applicable statute, A.R.S. § 16–123, applies to all special elections, whereas the registration statute in *Stephens* applied only to elections for mayor and aldermen. The voters in Page, unlike those in *Stephens*, were on perpetual notice that the registration requirements of A.R.S. § 16–123 applied to any special bond election, whenever called. Thus, while the citizens in *Stephens* had no reason to believe they needed to keep their registration current in order to vote in a bond election, the citizens of Page did. Second, and more important, the plaintiffs in *Stephens* were able to prove that but for the disenfranchisement, the result of the contested election might have been different. They proved that at least 700 persons were affected, that large numbers of otherwise qualified persons wishing to vote were turned away from the polls, and that a great number of voters stayed away from the polls because they believed that an attempt to vote would be futile. Given that only 350 votes were cast in the *Stephens* election, and that 700 persons were

disenfranchised, there was a clear indication that the result could have been affected had the city provided an opportunity to register.

In summary, because nothing in the statutes required Page to provide citizens an opportunity to register before the special bond election, the city did not offend the elective franchise by calling the election after registration was cut off. Even if the procedure were improper, Moore has failed to prove fraud or that the result would have been different if proper methods had been followed.

## RATE OF INTEREST ON BONDS

Moore contends that A.R.S. § 9–512(A), found in Article 2, Title 9 of the Arizona Revised Statutes, limits the amount of interest the bonds could bear to nine percent, and that the election should therefore be set aside because the city represented in the resolution of election, the notices of election, and the ballot that the bonds could be offered for up to thirteen percent interest. Appellees counter that the bonds could properly be offered at thirteen percent. An alternative argument is that Moore has failed to show that the alleged misrepresentation affected the result of the election.

To decide the point requires us to negotiate a maze of statutory provisions which do not mesh perfectly. The conflict revolves around whether the bonds must be issued under Article 2, Title 9, Arizona Revised Statutes, of which A.R.S. § 9–512(A) is a part, or whether they may be issued under Article 3 of the same title. Before discussing the nuances of the relevant statutes, it is important to summarize the arguments of the parties; Moore claims that Article 2, with its nine percent interest restriction was intended to apply when a municipal corporation wishes to begin operating a utility, that is, when it undertakes to conduct a utility enterprise for the very first time. The provisions of Article 3, he argues, may be used only after a municipality acquires a utility and seeks to extend or

improve it. The City of Page contends that the terms of Article 3, with its allowance of unrestricted interest simply supersedes Article 2 and applies to the bonds to be issued here.

Moore points to three statutes for support: A.R.S. §§ 9–511 and 9–512, which are found in Article 2, and A.R.S. § 9–539, which is found in Article 3. They read in relevant part as follows:

§ 9–511 Power to engage in business of public nature; right of eminent domain.
A. A municipal corporation may engage in any business or enterprise which may be engaged in by persons by virtue of a franchise from the municipal corporation, and may construct, purchase, acquire, own and maintain within or without its corporate limits any such business or enterprise. A municipal corporation may also purchase, acquire, and own real property for sites and rights of way for public utility and public park purposes, and for the location thereon of water works, electric and gas plants, municipal quarantine stations, garbage reduction plants, electric lines for the transmission of electricity, pipe lines for the transportation of oil, gas, water and sewage, and for plants the manufacture of any material for public improvement purposes or public buildings.
B. The municipality may exercise the right of eminent domain either within or without its corporate limits for the purposes as stated in Subsection A of this section, . . . .

\* \* \* \* \* \*

§ 9–512 Issuance of bonds; service rates.
A. The municipal corporation, for any and all purposes provided in § 9–511, may issue and sell bonds bearing interest not to exceed nine per cent [sic] per annum.

\* \* \* \* \* \*

Arizona Revised Statute § 9–539 (the Title 3 provision) reads, in relevant part:

§ 9–539 General powers of municipality under article.

There is vested in a municipality by this article full power:
1. To issue revenue bonds for the purpose of paying the cost of the improvement, reconstruction, extensions and additions to any existing revenue-producing utility of any kind or class at the time owned and operated by the municipality, however acquired.

\* \* \* \* \* \*

Moore argues that the words in A.R.S. § 9–511 (Article 2) "construct, purchase, acquire, own and maintain" denote the initial establishment of a utility system by a municipality. By contrast, the words in A.R.S. § 9–539 (Article 3) "improvement, reconstruction, extensions and additions" address only situations where the municipality already owns and operates a system. Thus, the argument goes, when Page sought to establish its own utility, as opposed to improving one it already owned, it could only do so under the terms of Article 2, which include the nine percent interest limitation of A.R.S. § 9–512(A).

The City of Page, on the other hand, bases its argument on A.R.S. §§ 9–522, 529 and 537, all found in Article 3, which read in relevant part:

§ 9–522 Power to issue bonds.
A. In addition to its other powers, a municipality may:
1. [W]ithin or without its corporate limits, construct, improve, reconstruct, extend, operate, maintain and acquire, by gift, purchase or the exercise of the right of eminent domain, a utility undertaking or part thereof, and acquire in like manner land, rights in land or water rights in connection therewith.

\* \* \* \* \* \*

§ 9–529 [I]nterest; . . . .
A. Bonds issued under this article . . . shall bear interest, payable semi-annually, at the rate set by the accepted bid which rate shall not exceed the maximum rate of interest set forth in the resolution calling the election, . . . .

\* \* \* \* \* \*

§ 9–537 **Supplemental nature of article.**

In so far as the provisions of this article are inconsistent with any other provision of law, the provisions hereof shall be controlling. The powers conferred by this article shall be in addition and supplemental to the powers conferred by any other law. Except as expressly provided in this article, the utility undertaking may be constructed, improved, reconstructed, extended and acquired, notwithstanding any other law providing for the construction, improvement, reconstruction, extension or acquisition of a like utility undertaking and without regard to the requirements, restrictions or other provisions contained in any law, including, but not limited to, §§ 9–511 to 9–514, inclusive. Bonds may be issued under this article for any utility undertaking, notwithstanding that any other law may provide for the issuance of bonds for a like purpose and without regard to the requirements, restrictions or provisions contained in any other law.

$$* \quad * \quad * \quad * \quad * \quad *$$

The city argues that the words "construct" and "acquire" in both A.R.S. § 9–522 and A.R.S. § 9–537 indicate that Article 3 can be construed to cover a situation in which a city first enters a utility undertaking. It also contends that the broad language of A.R.S. § 9–537 makes the nine percent interest limitation provision of A.R.S. § 9–512 (Article 2) inapplicable.

The rules of statutory construction require us to reconcile, if possible, the existence of Article 2 with the sweeping provisions of Article 3. Moore argues, and we agree, that if a city wishing to begin operating a utility for the first time is entitled to proceed under Article 3, then Article 2 would be meaningless, as there would be no situation in which it would be proper to issue bonds under Article 2 but improper to issue them under Article 3. We must avoid holding that A.R.S. § 9–522 and § 9–537 implicitly repeal Article 2, as "a court will not construe a statute as repealed by implication by another if it can avoid doing so on any reasonable hypothesis." *State Land Department v. Tucson Rock & Sand Co.,*

107 Ariz. 74, 77, 481 P.2d 867, 870 (1971). We thus must harmonize, if possible, the seemingly conflicting provisions.

Case law does not help us. The cases cited by the city in favor of its position deal with situations in which municipalities with existing utilities sought to expand operations by acquiring utilities which were operating in areas a city wished to serve. *See City of Mesa v. Salt River Project Agricultural Improvement & Power District,* 92 Ariz. 91, 373 P.2d 722 (1962); *Desert Waters, Inc. v. Superior Court of Pima County,* 91 Ariz. 163, 370 P.2d 652 (1962); *City of Scottsdale v. Municipal Court of the City of Tempe,* 90 Ariz. 393, 368 P.2d 637 (1962); and *Sende Vista Water Co. v. City of Phoenix,* 127 Ariz. 42, 617 P.2d 1158 (App.1980). None of these cases discuss whether the provisions of Article 3 may be used when a city initially desires to acquire a utility.

The city attempts to harmonize the statutes by arguing that the purpose of Article 3 was to authorize municipalities to finance the acquisition of utility undertaking through the issuance of revenue bonds, whereas the purpose of Article 2 is merely to grant cities the power to operate utilities. When one considers, however, that revenue bonds may be issued under Article 2, *see* A.R.S. § 9–512(B), and that general obligation bonds are permitted under Article 3, *see* A.R.S. § 9–522(A)(4), appellees' argument fails. The type of bond to be issued has no bearing on the question before us. The purpose of Article 2 and Article 3 is the same: to facilitate municipal ownership of utilities.

Moore's hypothesis that Article 2 applies when a city first seeks to acquire a utility and that Article 3 applies when it improves or extends that utility preserves the vitality of Article 2. It is necessary to decide if this hypothesis is reasonable in light of the applicable statutes. We are immediately confronted with the inconsistencies of various statutes in Article 3, namely, between A.R.S. § 9–522 and § 9–539. The former provision is broadly worded and speaks of *acquiring utilities.* The latter talks only

in terms of *extending and improving existing utilities*. Complicating matters is the broad scope of A.R.S. § 9–537, which seems to indicate that it is always proper to use Article 3, regardless of any other statutory provisions, including those found in Article 2.

We believe that A.R.S. § 9–539 is a general statement of the overall purpose of Article 3. It states that the provisions of Article 3 are for the improvement, reconstruction, and extensions and additions to existing utilities. Arizona Revised Statutes § 9–522 delineates the means by which an existing utility may be extended or improved, including the acquisition of an operating utility undertaking. Arizona Revised Statutes § 9–537 is in a sense a tautology. It says that if a utility undertaking is proper within Article 3, then the terms of Article 3 apply, notwithstanding inconsistent provisions in other statutes. If, however, Article 3 does not apply to a particular undertaking, then A.R.S. § 9–537 does not apply either. Therefore, bonds issued for the initial acquisition of a utility undertaking are not within the scope of A.R.S. § 9–539, and thus not within any provision found in Article 3. Since they are not within Article 3, the overriding language of A.R.S. § 9–537 simply does not apply to them. Thus the provisions of Article 2 apply to such bonds, including the nine percent interest ceiling of A.R.S. § 9–512.

That the legislature intended to preserve Article 2 notwithstanding the broad provisions of Article 3 is evidenced by Ariz.Laws 1970, ch. 89 wherein the legislature amended both A.R.S. § 9–512 to raise the interest ceiling of Article 2 bonds from six to nine percent and A.R.S. § 9–529 to raise the interest ceiling for Article 3 bonds from six percent to the maximum rate set forth in the resolution calling the election. By amending Article 2 in 1970, the legislature demonstrated it was aware that Article 2 existed and intended to continue its vitality. *See Tucson Rock & Sand,* 107 Ariz. at 77, 481 P.2d at 870. By amending Article 3 at the same time, and by allowing Article 3 bonds to be sold at a higher interest rate than Article 2 bonds, as opposed to the six

percent ceiling both types of bonds carried before the amendment, the legislature showed that it considered Article 2 and Article 3 to serve distinct purposes, and that it intended them to co-exist.

We thus hold that when a municipality seeks initially to acquire a utility, it must follow the provisions of Article 2. We believe this makes sense although, in the absence of legislative history, our explanation of the reasons for the statutes is necessarily speculative. The legislature could have intended that a municipality seeking to acquire a utility for the first time should act with caution. Thus, the nine percent interest ceiling either helps prevent an undue burden on the taxpayers if general obligation bonds are issued, or deters municipalities from charging exorbitant rates to repay the bonds if issued as revenue bonds. Once a utility has been acquired, however, there is a greater public interest in guaranteeing that it operates efficiently, especially since once a municipality obtains a utility, it operates it as a monopoly. *See* A.R.S. § 9–516. The legislature may have enacted Article 3 and allowed improvements to be financed at a higher interest rate in order to assure continued adequate operation of a utility. We thus agree with Moore that since the city was attempting to obtain a utility undertaking for the first time, it was bound by the provisions of Article 2, and thus could not issue the bonds at more than nine percent interest.

Moore must demonstrate, however, that the city representing to the voters that the bonds could be issued at thirteen percent somehow affected the result of the election. In an election contest it is not the substance which was voted on which concerns the court but whether the procedure by which the election was carried out was fair. Moore did not show by evidence, and cannot show by logic, that those who voted for the bonds at thirteen percent would have voted against them were they to be issued at nine percent. Further, Moore does not allege that the mistake on the

city's part was fraudulent. Given that the statutes involved appear to overlap, the city's action in advertising the bonds at thirteen percent was at worst a reasonable mistake of law. We will not upset the results of the election notwithstanding that Moore is correct in asserting the bonds are restricted by the provisions of Article 2 of Title 9, Arizona Revised Statutes.

## EFFECT OF THE PASSAGE OF THE RESOLUTION WITHOUT AN EMERGENCY CLAUSE

Moore makes two arguments growing out of the fact that the election resolution was passed without an emergency clause. The first is that the election should be overturned because the notice of election was published with the words "and declaring an emergency" included in the bold print title. The second is that since the resolution of election was not an emergency measure and under the terms of A.R.S. § 19–142(B) and Page City Code § 2–5–6 only became effective thirty days after being passed, any action taken sooner than thirty days after passage, including the publication of the notices of election, was void and of no effect. If the publication of notice was void, Moore argues, the election was held without notice, and is therefore void.

■■■ As to the notice of election having been published with the words "and declaring an emergency" in the title, Moore has presented no evidence to support his claim that these words, which were not on the ballot, confused voters or led anyone to vote for the measure that would not otherwise have done so. Moore never even proved that any voters actually read the notice of election. As he did not present any such proof, his argument fails. *Allison v. City of Phoenix*, 44 Ariz. 66, 77, 33 P.2d 927, 931 (1934).

More difficult to resolve is Moore's contention that the bond election was invalid because it was held without legal notice, the notice actually given being void because it was published prematurely. The question on this issue is whether we are

obliged to pretend that nothing was printed in the *Lake Powell Chronicle* on January 9 and January 16, 1985, and thereby further pretend that the voters in Page had no notice of the election, and consequently invalidate an election wherein a vast majority of persons voting clearly expressed their will in favor of the acquisition of the utility.

Moore relies on *State ex rel. Mittag v. Mayor of Borough of Park Ridge*, 61 N.J.L. 151, 38 A. 750 (1897) and *Shinall v. City of Catersville*, 144 Ga. 219, 87 S.E. 290 (1915), both of which invalidated elections because the notices thereof were unauthorized. We decline to follow these decisions, however, because we believe that Arizona case law requires a different result.

■■■ There is apparently no statutory requirement that notice of the election was necessary in this case. Moore asserts that A.R.S. § 9–524(B) required at least fifteen days notice prior to the election. This requirement, however, appears to apply only to elections for bonds issued under Article 3 of Title 9, Arizona Revised Statutes. The provisions for election to approve bonds to be issued under Article 2, A.R.S. § 9–514, contains no notice requirement. If, indeed, there is no requirement for notice then Moore's argument dies aborning. But even assuming that fifteen-days notice was required in this case, the election was valid because Moore has failed to prove that the premature notice affected the result of the election.

■■■ The sole purpose of publishing notice of an election "is to warn the electors that an election is to be held.... [S]ubstantial compliance with the statute is all that is required." *McLoughlin v. City of Prescott*, 39 Ariz. 286, 292, 6 P.2d 50, 52 (1931). After an election, statutory notice requirements become directory, and an election will be invalidated only if:

> it appears that the failure to give notice for the full time specified by the statute has prevented electors from giving a full

and free expression of their will at the election, or unless the statute contains a further provision, the necessary effect of which is that failure to give notice for the statutory time will render the election void.

*McLoughlin,* 39 Ariz. at 294, 6 P.2d at 53. Neither A.R.S. § 9–524(B) nor A.R.S. § 9–514 contains a provision voiding an election if notice requirements are not met. Although *McLoughlin* is a case dealing with late notice of elections, we believe its terms apply equally to notice given too early. The question is thus not on what day the notice of election should have been published, but whether or not the voters of the City of Page were adequately apprised of the upcoming election. It is important in this respect that the notices were "premature," not with respect to the date of the election, but because they were published before the ordinance which authorized them became effective. If "the election has been honestly and fairly conducted and no one has been injured by the manner in which preliminary steps leading thereto have been taken ... no reason exists for declaring it invalid." *McLoughlin,* 39 Ariz. at 297–98, 6 P.2d at 54. Even if the notices were published without authority, they were nonetheless published, giving voters advance knowledge of the election, which is the sole purpose of notice prior to an election.

A common thread throughout Moore's arguments is that he seeks a means to overturn the election automatically without regard to whether fraud occurred or an irregularity affected the result. The importance of validating an election wherein a majority of voters has spoken requires Moore to bear his burden of proof to show quantifiable harm with regard to all his claims. He has failed to do so on this issue; therefore, his argument falls. Some irregularities might automatically invalidate an election, but this case simply does not present such a situation. Further, we do not believe that the publication of the notice of election was premature in any but the most technical sense. The gist of the resolution was to authorize the holding of an election. The giving of notice was a preparatory and peripheral act.

Another reason that the "unauthorized" publication of notice of the election should not vitiate the election has to do with the purpose of A.R.S. § 19–142(B), the statute that decrees that no ordinance shall be effective until thirty days after enactment. The purpose of A.R.S. § 19–142(B) and Page City Code § 2–5–6, or at least one important purpose of these provisions, is to allow voters to petition for a referendum on the ordinance, franchise, or resolution passed by a city or town council. The applicable statute, A.R.S. § 19–142(B) is found in Article 4 of Title 19, Arizona Revised Statutes, "Initiative and referendum in cities, towns, and counties." It is a weak argument that a resolution calling for an election is subject to referendum when in fact, the election itself serves the same purpose. Were we to accept Moore's view, the resolution calling for the election was subject to referendum, which could force an election as to whether there should be an election on a referred measure. This would entail two elections on the same measure, a circumstance that militates against a rigid application of the statute under the facts of this case. *See Campbell v. City of Eugene,* 116 Or. 264, 279–80, 240 P. 418, 423 (1925).

## BURDEN OF PROOF

 Finally, Moore argues that the cumulative effect of the irregularities complained of casts a suspicion of fraud over the election, or at least is enough to shift the burden of proof from Moore to those who seek to uphold the results of the election. Assuming that everything that Moore complains of was indeed an election irregularity, given the irrefutable and innocent explanation of the need for haste on the city's part and Moore's quite proper refusal to allege fraud in fact, we do not

believe the burden of proof shifted to the city to uphold the results of the election.

 For the foregoing reasons, we affirm the judgment below. We vacate the finding of the trial court that the bonds can bear interest in excess of nine percent. We award appellees costs but reject their claim for attorney's fees under A.R.S. § 12–341.01 because that section applies only to contract actions, not election contests. Since there is no statutory provision for attorney's fees in an election contest, we have no authority to grant attorney's fees under Rule 21(c), Arizona Rules of Civil Appellate Procedure.

Affirmed.

CORCORAN, J., concurs.

EUBANK, Judge, specially concurring: I concur in the result.